In the Matter of the Application of LIBE-RIAN EASTERN TIMBER CORPORA-TION, Arbitration Award Creditor, Plaintiff,

v.

The GOVERNMENT OF the REPUBLIC OF LIBERIA, Arbitration Award Debtor, Defendant.

Civ. A. No. 87–173.

United States District Court, District of Columbia.

April 16, 1987.

Nicholas H. Cobbs, Washington, D.C., Thomas D. Troy, New York City, for plaintiff.

Charles A. Patrizia, Bruce D. Ryan, Washington, D.C., Philip F. Grant, Barry J. Mandel, Allan Dinkoff, Reginald F. Lewis, Charles Clarkson, W. Kevin Wright, New York City, for defendant.

## MEMORANDUM OPINION

STANLEY S. HARRIS, District Judge.

This matter is before the Court on defendant The Government of the Republic of Liberia's (hereinafter Liberia) emergency motion for relief from orders attaching bank accounts of the Embassy of the Republic of Liberia, and for a temporary restraining order and a preliminary injunction against further attachment of embassy accounts. The Court previously issued a short Order on January 14, 1987, directing that Liberia's motion shall be treated as a motion to quash the writs of attachment seizing Liberia's bank accounts and stating that the motion was granted. This opinion, prepared after the parties filed post-hearing briefs, constitutes the Court's findings of facts and conclusions of law from which a party may appeal.

### Facts

Plaintiff Liberian Eastern Timber Corporation (hereinafter LETCO) successfully sought in the United States District Court for the Southern District of New York an ex parte order directing entry of judgment for $9,076,857.25, based upon an arbitration award rendered against defendant Liberia. Pursuant to the judgment, writs of execution were issued to the United States Marshal for the Southern District of New York. Subsequently, in the same court, Liberia moved, *inter alia*, to enjoin the execution of the judgment. That court held LETCO to be enjoined from issuing executions against certain government property, but also ruled that "LETCO is not enjoined from issuing executions with respect to any properties which are used for commercial activities and that may fall within one of the exceptions delineated in section 1610 [of USC Title 28]."

LETCO then recorded the judgment in this court, and this court issued writs of attachment which were served on Riggs National Bank and First American Bank (as well as on other banks in which Liberia appears to have no accounts) to notify the banks that the writs seized "any credits other than wages, salary, commissions or pensions of the defendant, The Government of the Republic of Liberia, The Republic of Liberia, or The Embassy of the Republic ... of Liberia or any of their agencies, that are used for commercial activities as such activities are defined in *'Birch Shipping Corp. v. Embassy of the Republic of Tanzania,'* [*sic*], 507 F.Supp. 332 [*sic*] (D.D.C. 1980)," sufficient to satisfy the judgment against Liberia.

The writs seized two bank accounts at Riggs National Bank and three accounts at First American Bank.[1] These accounts are used for the functioning of the Liberian

---

1. Following the hearing on the motion to quash the parties stipulated that defendant also holds a bank account in the name of The Liberian Embassy at American Security Bank in Washington, D.C., and that the Court's Order of January 14, 1987, shall apply to the Embassy account at American Security Bank to the same extent as it applies to the Embassy accounts at Riggs National Bank and First American Bank.

Embassy and for the central bank of the Republic of Liberia.

### Discussion

■ The Court concludes that the bank accounts of the Embassy of Liberia are immune from attachment under the Vienna Convention, 23 U.S.T. 3227, Apr. 18, 1961, T.I.A.S. No. 7502.

The Vienna Convention provides in Article 25 that "[t]he receiving State shall accord full facilities for the performance of the functions of the mission." 23 U.S.T. at 3238. The Liberian Embassy lacks the "full facilities" the Government of the United States has agreed to accord if, to satisfy a civil judgment, the Court permits a writ of attachment to seize official bank accounts used or intended to be used for purposes of the diplomatic mission.

If the "full facilities" to which the United States agreed to "accord" diplomatic immunity did not include bank accounts off the premises of the mission, the Liberian Embassy either would have to take grossly inconvenient measures, such as issuing only checks drawn on a Liberian bank, or would have to run the risk that judgment creditors of Liberia would cause the accounts the Embassy holds at banks located in the United States to be seized for an indefinite length of time, severely hampering the performance of the Embassy's diplomatic functions. Moreover, to interpret the term "accord," as used in Article 25, as merely allowing the Liberian Embassy to use bank accounts located in the United States but not affording the accounts the protection of diplomatic immunity would pay mere lip service both to Article 25 and to the intent of the Vienna Convention, as stated in its Preamble: "to ensure the efficient performance of the functions of diplomatic missions as representing States." 23 U.S.T. at 3230. The Liberian Embassy

hardly could function efficiently without local bank accounts.

At the hearing on Liberia's motion, LETCO argued that only funds maintained on the premises of the mission are to be afforded diplomatic immunity because only property described in Article 22(3) of the Vienna Convention is exempt from attachment.[2] The Court does not agree with LETCO's contention. Article 22(3) does not provide the exclusive authority in the Vienna Convention to determine which property enjoys diplomatic immunity from attachment. Article 31 states that immovable property used for the purposes of the mission enjoys immunity from civil and administrative jurisdiction. Article 24 states that the archives and documents of the mission are inviolable wherever they may be. Although no provision of the Vienna Convention states specifically that official bank accounts used or intended to be used for purposes of the diplomatic mission enjoy diplomatic immunity from attachment, the Court concludes that not affording diplomatic immunity to the Embassy's bank accounts, despite the absence of such a specific provision, is inconsistent with both the agreement set forth in Article 25 and the intention of the parties to the Vienna Convention.

■ Under the Vienna Convention, therefore, the bank accounts of the Liberian Embassy used or intended to be used for purposes of the diplomatic mission are immune from attachment to satisfy a civil judgment. Although a finding of diplomatic immunity under the Vienna Convention resolves this matter as to the bank accounts of the Liberian Embassy, the Court also discusses the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1062–1611, to make clear that the bank accounts of the Liberian Embassy are immune from attachment regardless of a finding of diplomatic immunity.[3]

---

2. Article 22(3) of the Vienna Convention provides:

> 3. The premises of the mission, their furnishings and other property thereon and the means of transport of the mission shall be immune from search, requisition, attachment or execution.

3. The Court notes that Congress did not intend the FSIA to affect diplomatic immunity under the Vienna Convention. See H.Rep. No. 1487, 94th Cong., 2d Sess. at 12, U.S.Code Cong. & Admin.News 1976, p. 6604. Indeed, 28 U.S.C. § 1609 explicitly states that Congress enacted the FSIA "[s]ubject to existing international

The FSIA sets forth, *inter alia*, when a foreign state's property in the United States is not entitled to immunity from attachment. Title 28 U.S.C. § 1609 sets forth the general rule regarding sovereign immunity from attachment: "[T]he property in the United States of a foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611 of this chapter." [4]

LETCO, in accordance with the injunction ordered by the District Court for the Southern District of New York, relies on an exception to the general rule of immunity, 28 U.S.C. § 1610(a)(1), which provides:

> (a) The property in the United States of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if—

> > (1) the foreign state has waived its immunity from attachment in aid of execution or from execution either explicitly or by implication, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver....

> \*    \*    \*    \*    \*    \*

■ 28 U.S.C. § 1610(a)(1) sets forth a two-step analysis to determine immunity: first, the foreign state must have waived its immunity and, second, the property attached must be used for a commercial activity. *Birch Shipping v. Embassy of the United Republic of Tanzania*, 507 F.Supp. 311, 312 (D.D.C.1980).

The District Court for the Southern District of New York has determined that Liberia waived its sovereign immunity in the United States with respect to enforce-ment of the judgment now recorded in this Court. *Liberian Eastern Timber Corporation v. The Government of the Republic of Liberia*, 650 F.Supp. 73, 76–77 (S.D.N.Y. 1986).

As to whether the property attached was used for a commercial activity, Congress, at 28 U.S.C. § 1603(d), stated:

> (d) A "commercial activity" means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

The legislative history of the FSIA expands upon the meaning of commercial activity as follows:

> [T]he fact that goods or services to be procured through a contract are to be used for a public purpose is irrelevant; it is the essentially commercial nature of an activity or transaction that is critical. Thus, a contract by a foreign government to buy provisions or equipment for its armed forces or to construct a government building constitutes a commercial activity. The same would be true of a contract to make repairs on an embassy building. Such contracts should be considered to be commercial contracts, even if their ultimate object is to further a public function.

> By contrast, a foreign state's mere participation in a foreign assistance program administered by the Agency for International Development (AID) is an activity whose essential nature is public or governmental, and it would not itself constitute a commercial activity. \* \* \* However, a transaction to obtain goods or services from private parties would not lose its otherwise commercial character because it was entered into in connec-

---

agreements to which the United States is a party at the time of enactment of this Act...." The United States was a party to the Vienna Convention at the time Congress enacted the FSIA, so the provisions of the Vienna Convention are controlling over the FSIA.

**4.** In addition to the Embassy accounts, one of the attached bank accounts is used for the central bank of Liberia and, as LETCO conceded at the hearing on the motion, that bank account is immune from attachment under the FSIA, 28 U.S.C. § 1611(b)(1). The remainder of this opinion addresses the attached bank accounts of the Liberian Embassy.

tion with an AID program. Also public or governmental and not commercial in nature, would be the employment of diplomatic, civil service, or military personnel, but not the employment of American citizens or third country nationals by the foreign state in the United States.

\*　　\*　　\*　　\*　　\*　　\*

H.Rep. No. 1487, 94th Cong., 2d Sess. at 16, U.S.Code Cong. & Admin.News 1976, p. 6615.

■ The "rule of thumb" used to determine whether activity is of a commercial or public nature is "if the activity is one in which a private person could engage, it is not entitled to immunity." *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1549 (D.C.Cir.1987) (quoting *Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 309 (2d Cir.1981)).

■ The concept of "commercial activity" should be defined narrowly because sovereign immunity remains the rule rather than the exception, *Gibbons v. Republic of Ireland*, 532 F.Supp. 668, 670–71 (D.D.C. 1982), and because courts should be cautious when addressing areas that affect the affairs of foreign governments. *See* 14 C. WRIGHT, A MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE, § 3662, 382–83 (1985).

■ The Liberian Embassy bank accounts are "utilized for the maintenance of the full facilities of Liberia to perform its diplomatic and consular functions as the official representative of Liberia in the United States of America, including payment of salaries and wages of diplomatic personnel and various ongoing expenses incurred in connection with diplomatic and consular activities necessary to the proper functioning of the Embassy." Greaves Affidavit, ¶ 6. The essential character of the activity for which the funds in the accounts are used, therefore, undoubtedly is of a public or governmental nature because only a governmental entity may use funds to perform the functions unique to an embassy. *See MacArthur Area Citizens Association v. Republic of Peru*, 809 F.2d 918, 920 (D.C.Cir.1987).

The Court presumes that some portion of the funds in the bank accounts may be used for commercial activities in connection with running the Embassy, such as transactions to purchase goods or services from private entities. The legislative history of the FSIA indicates that these funds would be used for a commercial activity and not be immune from attachment. The Court, however, declines to order that if any portion of a bank account is used for a commercial activity then the entire account loses its immunity. *Cf. Birch*, 507 F.Supp. at 313. On the contrary, following the narrow definition of "commercial activity," funds used for commercial activities which are "incidental" or "auxiliary," not denoting the essential character of the use of the funds in question, would not cause the entire bank account to lose its mantle of sovereign immunity. *See Practical Concepts*, 811 F.2d 1543, 1549.

Indeed, a diplomatic mission would undergo a severe hardship if a civil judgment creditor were permitted to freeze bank accounts used for the purposes of a diplomatic mission for an indefinite period of time until exhaustive discovery had taken place to determine the precise portion of the bank account used for commercial activities.[5] Such a scenario would practically gut one of the purposes behind immunity: to afford deference to the governmental affairs of foreign states. In addition, requiring diplomats to segregate funds of a public character from commercial activity funds to avoid the risk of attachment is not the solution. Courts, let alone diplomats, have difficulty determining whether funds are public or commercial in nature. *See, e.g., Texas Trading*, 647 F.2d 308–10.

---

**5.** This would be a difficult task at best because Article 24 of the Vienna Convention provides that "[t]he archives and documents of the mission shall be inviolable at any time and wherever they may be." Article 29 provides that "[t]he person of a diplomatic agent shall be inviolable. He shall not be liable to any form of arrest or detention...." Article 31(c)(2) provides, "[a] diplomatic agent is not obliged to give evidence as a witness." 23 U.S.T. at 3238, 3240, 3241.

In conclusion, the bank accounts of the Liberian Embassy are immune from attachment both because they enjoy diplomatic immunity under the Vienna Convention and because no exception of the FSIA applies to deprive the bank accounts of their grant of sovereign immunity. Also, as noted above, the bank account used for the central bank of Liberia is immune under 28 U.S.C. § 1611(b)(1).