**WESTON COMPAGNIE DE FINANCE ET D'INVESTISSEMENT, S.A.,**
Plaintiff,

v.

**LA REPUBLICA DEL ECUADOR,**
**et al., Defendants.**

No. 93 Civ. 2698 (LMM).

United States District Court,
S.D. New York.

June 11, 1993.

Michael Strauss and Ellen Wahl Parker of Davis, Scott, Weber & Edwards, P.C., New York City, for plaintiff, Weston Compagnie de Finance et d'Investissement.

George Weisz of Cleary, Gottlieb, Steen & Hamilton, New York City, for defendant, La Republica del Ecuador.

*MEMORANDUM AND ORDER*

McKENNA, District Judge.

**1.**

Plaintiff, a "financial institution" organized under the laws of Switzerland, "[a] substantial part of [the business of which] has involved the acquisition and trading of Latin American debt" (Gerstel Decl. ¶ 2), commenced this action on April 26, 1993 to recover $20,756,959.74 in principal and $9,587,360.34 in interest (computed as of February 16, 1993) from the Republic of Ecuador (the "Republic"), its central bank, Banco Central del Ecuador (the "Central Bank"), and various entities which, for purposes of the present motions at least, the Court takes to be agencies or instrumentalities of the Republic within the meaning of 28 U.S.C. § 1603(b). Plaintiff brings the action as the purchaser, presumably at a substantial discount, and the assignee of interests in "a number of loan agreements entered into or guaranteed by [the Republic and the Central Bank] and two of Ecuador's agencies and instrumentalities, including its state electric company." (*Id.* ¶ 3.)[1]

On April 27, 1993, the Judge to whom this case was previously assigned granted, on the *ex parte* application of plaintiff, an order of attachment pursuant to New York Civil Practice Law and Rules Article 62.[2] The order permitted the attachment of up to $10,000,000, and required the furnishing of an undertaking in the sum of $250,000; it exempted from levy "(i) property belonging to any consulate or embassy of Ecuador; (ii) any gold reserves maintained in the Federal Reserve Bank of New York; or (iii) any property that is, or is intended to be, used in connection with a military activity and is of a military character or is under the control of a military authority or defense agency."

According to the most recent information supplied to the Court (Letters from Pl.'s Counsel to Court of May 25, 1993 and June 8,

---

1. The Central Bank has suggested the possibility that this action may be barred by New York Judiciary Law § 489, prohibiting "corporations from soliciting or buying assignments of loans 'with the intent and for the purpose of bringing an action or proceeding thereon.'" (Defs.Mem. at 4 (quoting N.Y.Jud.Law § 489 (McKinney 1983))). The record on this possible issue is incomplete, and the Court does not pass upon it at this time.

2. The New York attachment procedure is applicable pursuant to Fed.R.Civ.P. 64.

1993) and other information contained in the parties' submissions, levies have been made on the following amounts in accounts in the name of the Central Bank: (i) Swiss Bank Corporation, $204,490.22; (ii) The Chase Manhattan Bank, N.A., $246,086.00; (iii) Bankers Trust Company, $3,159.82; and (iv) Chemical Bank, $10,885.02.[3] Swiss Bank Corporation, however, has set off against amounts due to it the entire amount described in ¶ (i); plaintiff does not contest the setoff, and says that its motion to confirm is moot as to the Swiss Bank Corporation account.

Plaintiff moves (i) to confirm the order of attachment and (ii) for an order requiring "defendants to return to the jurisdiction of this Court any such assets as may at any time have been transferred out of or through New York on or after 1:30 p.m., April 27, 1993, where they shall then become subject to the Order of Attachment in an aggregate up to the amount of $30 million." (Notice of Mot. at 2.) The Central Bank cross-moves for (i) an order vacating the order of attachment "because the funds of the Central Bank attached pursuant to the Order are absolutely immune from prejudgment attachment under the Foreign Sovereign Immunities Act ["FSIA"], 28 U.S.C. § 1602, et seq., and, [ii] in the event any part of the Order [of attachment] is confirmed," an order increasing the amount of the undertaking required of plaintiff to $25 million. (Notice of Cross–Mot. at 1–2.)

**2.**

The FSIA specifically addresses attachment in three sections.

28 U.S.C. § 1609 lays down the general rule that "[s]ubject to existing international agreements to which the United States is a party at the time of enactment of this Act [1976] the property in the United States of a

foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611 of this chapter." 28 U.S.C. § 1609 (1988). Neither plaintiff nor the Central Bank relies on an international agreement, and, for purposes of 28 U.S.C. §§ 1609, 1610 and 1611, the Central Bank (as well as the Republic and, presumably, the other defendants) comes within the definition of "foreign state" of 28 U.S.C. § 1603(a).

28 U.S.C. § 1610 sets out exceptions to § 1609. As far as prejudgment attachment, at issue here, is concerned, § 1610(d) provides that:

> The property of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment prior to the entry of judgment in any action brought in a court of the United States or of a State, or prior to the elapse of the period of time provided in subsection (c) of this section, if—
>
> > (1) the foreign state has explicitly waived its immunity from attachment prior to judgment, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver, and
> >
> > (2) the purpose of the attachment is to secure satisfaction of a judgment that has been or may ultimately be entered against the foreign state, and not to obtain jurisdiction.

28 U.S.C. § 1610(d) (1988). The Central Bank does not appear to contest, for purposes of the present motions, its general waiver of immunity from attachment prior to judgment, nor that the purpose of the attachment is to secure satisfaction of an ultimate

---

**3.** The Chase Manhattan Bank, N.A. account referred to in ¶ (ii) includes $84,795.92 described by the Central Bank as "funds belonging to private parties," that amount and the balance of the account being "commingled" (Yépez Aff. ¶ 7). Not at issue on the present motions are (i) some $4,600,000 in funds of defendant Flota Petrolera Ecuatoriana on deposit with Citibank, N.A. on April 27, 1993, which are the subject of a consent order dated April 29, 1993 (Straus Aff. of May 10, 1993 ¶¶ 9–12), (ii) certain funds of the Cen-

tral Bank on deposit with The Chase Manhattan Bank, N.A. on April 27, 1993 (in a different account than that referred to above) "used to pay the salaries of Ecuadorian diplomats" (Yépez Aff. ¶ 7), which, the Court is informed, plaintiff did not intend to attach (Pl.Reply Mem. at 3 n. 3), and will not be restrained (Defs.Mem. at 7), or (iii) $92,321.92 in funds of defendant Ecuatoriana de Aviación on deposit with Chemical Bank, in regard to which there is no opposition to the motion to confirm. (Pl.Reply Mem. at 3.)

judgment, and not to obtain jurisdiction. It relies, rather, on 28 U.S.C. § 1611.

28 U.S.C. § 1611 sets out certain exceptions to § 1610. The Central Bank relies specifically on § 1611(b)(1), which provides that:

> Notwithstanding the provisions of section 1610 of this chapter, the property of a foreign state shall be immune from attachment and from execution, if—
>
> (1) the property is that of a foreign central bank or monetary authority held for its own account, unless such bank or authority, or its parent foreign government, has explicitly waived its immunity from attachment in aid of execution, or from execution, notwithstanding any withdrawal of the waiver which the bank, authority or government may purport to effect except in accordance with the terms of the waiver.

28 U.S.C. § 1611(b)(1) (1988).[4]

These provisions present two issues. The first is whether the Central Bank's waiver of immunity from attachment—given in broad terms and explicitly waiving immunity from prejudgment attachment[5]—renders the immunity provided by § 1611(b)(1) unavailable; the second, whether the funds on which levies have been made are "property ... of a foreign central bank ... held for its own account" within the meaning of the statute.

### 3.

■■■ While 28 U.S.C. § 1610 provides for the waiver both of "immunity from attachment in aid of execution," 28 U.S.C. § 1610(a)(1), and of "immunity from attachment prior to judgment," 28 U.S.C. § 1610(d)(1), 28 U.S.C. § 1611 refers only to waiver of "immunity from attachment in aid of execution." 28 U.S.C. § 1611(b)(1) (1988). Plaintiff argues that, "[n]otwithstanding the absence of an express reference in Section 1611(b)(1) to prejudgment attachments, there is good authority for permitting prejudgment as well as postjudgment attachment of central bank assets on showing of a valid waiv-

er." (Pl.Mem. at 17 (citing Charles N. Brower et al., *The Foreign Sovereign Immunities Act of 1976 in Practice*, 73 Am.J.Int'l L. 200, 209 (1979) (hereinafter *"FSIA in Practice")*).) That citation, however, is not very good authority at all for the proposition that 28 U.S.C. § 1611(b)(1) provides for waiver of prejudgment attachment. Indeed, it notes that comparison of the waiver provisions of § 1611(b)(1) with those of § 1610(d)(1) "appears on the surface to eliminate attachment prior to the entry of judgment in actions against a foreign central bank or monetary authority, even in cases involving a specific waiver of such immunity." *FSIA in Practice* at 209. The authors recommend amendment of the statute to eliminate this "doubtless unintended anomaly" because there "is no logic to such a result and it could not have been intended," but do not cite any legislative history to support this position. *Id.*

The meaning of the omission of a reference in 28 U.S.C. § 1611(b)(1) to waiver of immunity from prejudgment attachment is debatable. *See Banque Compafina v. Banco de Guatemala*, 583 F.Supp. 320, 322–23 (S.D.N.Y.1984) (*dictum*). This Court, however, does not accept the suggestion of *FSIA in Practice* at 209 (quoted in *Banque Compafina*, 583 F.Supp. at 323) that the absence of the reference is a "doubtless unintended anomaly," and concludes that § 1611(b)(1) purposely did not provide for prejudgment attachment of property of foreign central banks held for their own account.

It is plain from the structure of the FSIA that "property ... of a foreign central bank or monetary authority held for its own account," 28 U.S.C. § 1611(b)(1), was intended by Congress to be accorded special treatment. The House Report on the bill that resulted in the FSIA suggests reasons for this treatment. "If execution could be levied on such funds without an explicit waiver [permitted by the statute in the case of postjudgment attachment], deposit of foreign funds in the United States might be discour-

---

**4.** 28 U.S.C. § 1611(b)(2) provides an exception for property used or intended to be used in connection with a military activity and either of a military character or under the control of a military authority or defense agency. This immunity

is reflected in the *ex parte* order of attachment, but the immunity provided in § 1611(b)(1) is not.

**5.** (*See* example quoted in Defs.Mem. at 15–16.)

aged. Moreover, execution against the reserves of foreign states could cause significant foreign relations problems." H.Rep. No. 1487, 94th Cong., 2d Sess. 31 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6630. Such foreseen problems would be magnified if prejudgment attachment were permitted. It is clear that prejudgment and postjudgment attachments are remedies not only with different bases but with significantly different effects. A postjudgment attachment, of course, will presumably follow discovery and a trial at which all relevant facts and legal issues can be fully explored, and the judgment creditor will have had a full opportunity to present any defenses it may have. A prejudgment attachment, on the other hand, is normally the product, initially, of an *ex parte* application on papers; although a prompt motion to confirm, on notice, will follow, that motion, again, will rarely present the sort of opportunity for the full exploration of issues that a trial does. And, during the period between a levy under an *ex parte* order of attachment and determination of a motion to confirm, however brief, the effect of the attachment can be very disruptive. It does not require a great deal of legal experience to realize the considerable tactical advantage that an *ex parte* order of attachment can afford a plaintiff, whatever the subsequent procedural safeguards provided by a particular statute. "[P]rejudgment attachment ... is unique in that it affords plaintiff a substantial measure of relief absent a final determination that plaintiff is entitled to any relief whatsoever." *New England Merchants Nat'l Bank v. Iran Power Generation & Transmission Co.*, 502 F.Supp. 120, 126–27 (S.D.N.Y.1980), *petition denied, remanded,* 646 F.2d 779 (2d Cir. 1981). Against the background of the potentially disruptive effect of a prejudgment attachment and the potential foreign policy implications that effect may have, this Court finds that there was reason for Congress not to provide for waiver of prejudgment attachment of property of central banks held for

their own account, and that it did not, in fact do so. The Court accordingly concludes that neither the Central Bank nor the Republic waived immunity from prejudgment attachment of the Central Bank's funds held for its own account because the statute does not provide for, or contemplate, such a waiver.

**4.**

It is only "property ... of a foreign central bank or monetary authority held for its own account" that is immune from attachment under 28 U.S.C. § 1611(b)(1). While plaintiff appears to concede that the Central Bank is a "central bank" within the meaning of this provision,[6] it argues that the funds upon which levies were made are not "property [of the Central Bank] held for its own account."

Plaintiff's argument appears to turn on a dichotomy between property of a central bank used for commercial activity and property of a central bank held for its own account. (Pl.Mem. at 18.) Where all, or even some,[7] of the funds of an account of a central bank are used for "ordinary commercial operations," plaintiff says, the account is not protected by the immunity provided by 28 U.S.C. § 1611(b)(1). (*Id.*) In the present case, however—the argument continues— "the bulk of the funds which were borrowed under [the loan agreements upon which suit is brought] were deposited directly into accounts of the Central Bank in New York, regardless of the identity of the borrower [the Republic and defendant Instituto Ecuatoriano de Electrificación] and regardless of the purpose for which the funds were borrowed." (*Id.* at 19.) These funds—plaintiff continues—were (according to statements in various of the loan agreements) intended to be, and ("[i]t ... appears") were, "used in connection with the financing of general social and economic activities of the Republic or of certain of its agencies other than the Central Bank." (*Id.* at 20.) Those uses, however, plaintiff claims, are not "true 'central banking activities' " (*id.* at 21), so that "with respect to the funds for which [plaintiff] now seeks recovery, the Central Bank

---

6. Even absent a concession, this Court is convinced by the May 14, 1993 affidavit of Mauricio Yépez N. that the Central Bank is a "foreign central bank" as that term is used in § 1611(b)(1).

7. Plaintiff refers to "mixed-use" funds, used in part for central banking, and in part for commercial, activities.

acted not as a central bank, but as any ordinary *commercial* bank. As such, the Central Bank's funds in the United States are clearly subject to prejudgment attachment in this, an ordinary commercial case." (*Id.* at 21–22.)

■ Plaintiff's argument, in this Court's view, is flawed. Property used for commercial activity and property of a central bank held for its own account are not mutually exclusive categories. Rather, as the structure of the FSIA makes clear, property of a central bank held for its own account is a category of property used for commercial activity. As noted above, 28 U.S.C. § 1609 renders all property of a foreign state in the United States immune from attachment, except as provided in §§ 1610 and 1611, which except from the operation of § 1609, upon certain conditions, "property in the United States of a foreign state ... used for a commercial activity in the United States." 28 U.S.C. § 1610(a) and (d) (1988). 28 U.S.C. § 1611(b)(1) then provides that, "[n]otwithstanding the provisions of section 1610 of this chapter, the property of a foreign state shall be immune from attachment ..." if it is property "of a foreign central bank or monetary authority held for its own account," subject to waiver of postjudgment attachment. 28 U.S.C. § 1611(b)(1), in other words, is an exception to § 1610, providing for immunity from attachment that would otherwise be allowed by § 1610. Without § 1610, no property of a foreign state would be subject to attachment; § 1610, however, allows attachment only of property "used for a commercial activity." The property referred to in § 1611(b)(1) therefore must be property used for a commercial activity: if it were not, it would not be attachable at all. It follows that a showing that property of a central bank is used for a commercial activity does not, of itself, exclude it from the immunity granted by § 1611(b)(1). Something more must appear.

That "something more" cannot, in the present case, be gotten out of the statutory requirement that the property be that "of a

foreign central bank." As Judge Woolsey once pointed out:

> [T]he best, if not the only, way in which the possession of a chose in action—such as a bank account—can be shown, is by showing in whose name the account stands, for the person in whose name the account stands has absolute control of it and that is all possession of a chose in action can mean.

*Bradford v. Chase Nat'l Bank,* 24 F.Supp. 28, 38 (S.D.N.Y.1938), *aff'd sub nom., Berger v. Chase Nat'l Bank,* 105 F.2d 1001 (2d Cir.), *aff'd mem.,* 309 U.S. 632, 60 S.Ct. 707, 84 L.Ed. 990 (1939). Any funds in an account in the name of a foreign central bank are thus funds "of" that foreign central bank. Here, the accounts at issue upon which levies have been made are in the name of the Central Bank, and they are therefore funds "of" the Central Bank. To say that, however, does not end the inquiry. Such funds are, under § 1611(b)(1), immune from attachment only if "held for [the foreign central bank's] own account." What the statutory phrase "for its own account" means is not that simple a question.

The House Report describes funds of a foreign central bank "held for its own account" as "funds used or held in connection with central banking activities, as distinguished from funds used solely to finance the commercial transactions of other entities or foreign states." H.Rep. No. 1487, 94th Cong., 2d Sess. 31 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6630.[8] On its face, this statement might seem to support the dichotomy proposed by plaintiff, that property used for commercial activity and property held by a central bank for its own account are mutually exclusive categories. To accept such a reading, however, would be to allow the House Report to supersede the actual language of the statute, a dubious course. As Judge Easterbrook has said:

> Statutes are not exercises in private language. They should be read, like a contractual offer, to find their reasonable import. They are public documents, negoti-

---

8. The Senate Report, S.Rep. No. 1310, 94th Cong., 2d Sess., is identical. *Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647

F.2d 300, 306 n. 18 (2d Cir.1981), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982).

ated and approved by many parties in addition to those who write the legislative history and speak on the floor. The words of the statute, and not the intent of the drafters, are the "law."

Frank H. Easterbrook, *The Role of Original Intent in Statutory Construction*, 11 Harv. J.L. & Pub.Pol'y 59, 60 (1988).

A useful approach, imprecise as it is, appears in Ernest T. Patrikis, *Foreign Central Bank Property: Immunity from Attachment in the United States*, 1982 U.Ill.L.Rev. 265 (1982) (hereinafter *"Foreign Central Bank Property"*). "[P]roperty of a central bank," the author suggests, "is immune from attachment if the central bank uses such property for central banking functions as such functions are normally understood, irrespective of their commercial nature." *Id.* at 277 (footnote omitted). Conversely, "[i]f an activity is to be regarded as commercial, as distinguished from a central bank activity, it should be an activity of the foreign central bank not generally regarded as a central banking activity." *Id.* at 277–78. In focusing on whether the funds at issue are used for central bank functions, the author, in the Court's view, respects the terms of the FSIA as written and accords proper recognition to the special status given by Congress to foreign central banks in the FSIA.

There is, however, no standard list of activities "normally understood" to be those of all central banks. Rather, "[c]entral monetary systems vary widely from country to country. Consequently, no simple definition adequately describes the characteristics of all central banks." *Id.* at 273–74. The author does set out two lists of activities that can be regarded as those of central banks, one his own, *id.* at 274 (citing H. Aufricht, *Comparative Survey of Central Bank Law* (1965)), the other from M.H. DeKoch, *Central Banking* 14 (4th ed. 1974). *Id.* at 274 n. 37. Such lists are helpful as suggesting what activities may be "normally understood" to be those of central banks, but are obviously not dispositive.

The principal account now at issue [9] is that with The Chase Manhattan Bank, N.A. having deposits of $161,290.08 (claimed by the Central Bank to be "held for its own account") and of $84,795.92 (described by the Central Bank as "funds belonging to private parties"). The Central Bank describes this account as follows:

> The second account held the funds of the Central Bank in an approximate amount of $160,000.00, commingled with funds belonging to private parties in an approximate amount of $60,000.00. With respect to all of these funds, the Central Bank is engaged in central banking and governmental functions for some of its citizens and for Ecuador's telephone company, Empresa Estatal de Telecomunicación (*"EMETEL"*). EMETEL uses the Central Bank to receive payments relating to services performed around the world. With respect to the other funds, the Central Bank merely acts as an intermediary bank.

(Yépez Aff. ¶ 7.) With regard to the larger of the deposits in this account—the $161,290.08—the Court cannot agree with plaintiff that the activities for which that deposit is held are not those of a central bank. According to M.H. DeKoch, *Central Banking* 14 (4th ed. 1974) (quoted in *Foreign Central Bank Property* at 274 n. 37), "[t]he performance of general banking and agency services for its government[ ]" is a function of a central bank. It follows that:

> When the central bank acts as a bank for its parent foreign state and its agencies and instrumentalities, however, it is engaged in a central banking and governmental function. Thus, the fact that a foreign central bank uses a dollar deposit account with a bank in the United States to make or receive payments relating to the commercial activities of other foreign government agencies does not cause the central bank's actions to be regarded as a commercial activity.

*Foreign Central Bank Property* at 277.

The second of the deposits in The Chase Manhattan Bank, N.A. account, how-

---

9. As noted above, plaintiff now regards its motion to confirm to be moot as regards the Swiss Bank Corporation account in the amount of $204,490.22.

ever,—the $84,795.92—consists of funds "belonging to private parties" with respect to which "the Central Bank merely acts as an intermediary bank." (Yépez Aff. ¶ 7.) The Central Bank has not suggested any convincing basis for finding such funds to be "held for its own account." For all that appears, the Central Bank is acting, with respect to such funds, just as would any ordinary bank in transmitting the funds of one private party to another.

The dual nature of the deposits in The Chase Manhattan Bank, N.A. account requires consideration of plaintiff's argument regarding "mixed-use" funds. Plaintiff relies on *Birch Shipping Corp. v. Embassy of United Republic of Tanzania,* 507 F.Supp. 311, 313 (D.D.C.1980) ("Central bank accounts are exempt [from attachment], but that exception is not applicable to accounts used for mixed purposes") (citing H.Rep. No. 1487, 94th Cong., 2d Sess. 31 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6630)). The Central Bank counters with *Liberian Eastern Timber Corp. v. Gov't of Republic of Liberia,* 659 F.Supp. 606, 610 (D.D.C.1987) ("[F]ollowing the narrow definition of 'commercial activity,' funds used for commercial activities which are 'incidental' or 'auxiliary,' not denoting the essential character of the use of the funds in question, would not cause the entire bank account to lose its mantle of sovereign immunity") (citation omitted).[10]

■ This Court cannot agree with plaintiff that the fact that an account of a foreign central bank containing funds used for a central banking function also contains some funds not so used will abrogate, as to the entire account, the immunity specifically conferred by Congress. Even the House Report, upon which plaintiff relies, seems to point toward a different result, in distinguishing between "funds used or held in connection with central banking activities" from those "used *solely* to finance the commercial transactions of other entities or of foreign states." H.Rep. No. 1487, 94th Cong., 2d Sess. 31 (1976), *reprinted in* 1976

U.S.C.C.A.N. 6604, 6630 (emphasis added). Further, as was pointed out in *Liberian Eastern Timber* (speaking of embassy accounts, but the principle applies equally, if not more, to accounts of central banks):

Indeed, a diplomatic mission would undergo a severe hardship if a civil judgment creditor were permitted to freeze bank accounts used for the purposes of a diplomatic mission for an indefinite period of time until exhaustive discovery had taken place to determine the precise portion of the bank account used for commercial activities. Such a scenario would practically gut one of the purposes behind immunity: to afford deference to the governmental affairs of foreign states.

659 F.Supp. at 610 (footnote omitted). At the same time, the Court cannot agree that the mere placing of funds not used for a central banking function in an account of a foreign central bank will immunize such funds from attachment. As noted in *Birch Shipping,* "a reading of the [FSIA] which exempted mixed accounts would create a loophole, for any property could be made immune by using it, at one time or another, for some minor public purpose." 507 F.Supp. at 313.

■ Where, as in the present case, the parties are able to promptly present information on a motion to confirm on the basis of which a court can distinguish between funds used in connection with a central banking activity and funds not so used, the better course, in the Court's view, is to apply the distinction, instead of finding the account either entirely immune or entirely not immune.

■ The Central Bank urges that that portion of the funds in The Chase Manhattan Bank, N.A. account which it holds as an intermediary cannot be attached because of the operation of New York Uniform Commercial Code § 4–A–503, which provides:

For proper cause and in compliance with applicable law, a court may restrain (i) a person from issuing a payment order to

---

10. Both *Birch Shipping* and *Liberian Eastern Timber* involved postjudgment attachments of embassy accounts. In *Liberian Eastern Timber,* the judgment creditor conceded that an attached account "used for the central bank of Liberia" was "immune from attachment under the FSIA, 28 U.S.C. § 1611(b)(1)." 659 F.Supp. at 609 n. 4.

initiate a funds transfer, (ii) an originator's bank from executing the payment order of the originator, or (iii) the beneficiary's bank from releasing funds to the beneficiary or the beneficiary from withdrawing the funds. A court may not otherwise restrain a person from issuing a payment order, paying or receiving payment of a payment order, or otherwise acting with respect to a funds transfer.

N.Y.U.C.C.Law § 4–A–503 (McKinney 1991).

Some indication of the purpose of § 4–A–503 appears from the Official Comment, which "states that 'intermediary banks are protected,' meaning that since the time in transit for funds transfers is brief, intermediary banks cannot be expected to comply with injunctions by creditors. Instead, creditor process should be directed at the originating or receiving banks." *Manufacturas Int'l, Ltda. v. Manufacturers Hanover Trust Co.*, 792 F.Supp. 180, 194 (E.D.N.Y.1992). However, as to this issue, the parties have not submitted adequate information, or, for that matter, argument concerning the meaning of § 4–A–503, for the Court to make a determination. For one thing, it is not clear whether, as to the funds in question, the Central Bank is acting as an "intermediary" bank in the sense apparently contemplated by the statute, or as a "receiving" bank, *i.e.*, the bank that will disburse the funds in question to a private party. Nor is it even clear that § 4–A–503 applies to attachments at all. The parties will, therefore, submit further factual material and legal argument on the issue within 10 days of the date of this Memorandum and Order.[11]

■ Plaintiff also argues (Pl.Reply Mem. at 8–9) that the Central Bank is not immune from prejudgment attachment under the law of Ecuador, and therefore cannot claim immunity from prejudgment attachment under the FSIA. That argument, however, has no foundation in the FSIA. Whatever Ecuador may permit within its own borders, Congress, by the FSIA, has provided immunity from prejudgment attachment as to funds of a central bank held for its own account, and,

as to accounts in the United States, the Court will follow the FSIA.

The Central Bank "merely acts as an intermediary bank" with respect to funds in the Bankers Trust Company account ($3,159.82) described above. (Yépez Aff. ¶ 8.) The same is the case with the funds in the account of the Central Bank with Chemical Bank, also described above, apparently attached after the parties' motion papers were submitted. (Letter from Defs.' counsel to Court of May 27, 1993.)

**5.**

For the foregoing reasons, and in the Court's discretion, *see Trigo Hnos., Inc. v. Premium Wholesale Groceries, Inc.*, 424 F.Supp. 1125, 1133 (S.D.N.Y.1976), the motion to confirm, and the cross-motion to vacate, the attachment are disposed of as follows:

1. Swiss Bank Corporation ($204,490.22): motion and cross-motion denied as moot.

2. The Chase Manhattan Bank, N.A. ($161,290.08 held for the Central Bank's own account as set forth above): motion to confirm denied and cross-motion to vacate granted.

3. The Chase Manhattan Bank, N.A. ($84,795.92 "belonging to private parties"): decision reserved.

4. Bankers Trust Company ($3,159.82): decision reserved.

5. Chemical Bank ($10,885.02): decision reserved.

6. Chemical Bank ($92,321.92 in account of defendant Ecuatoriana de Aviación): motion to confirm granted without opposition.

**6.**

The second branch of plaintiff's motion seeks an order requiring defendants "to return to the jurisdiction of this Court any such assets as may at any time have been transferred out of or through New York on or after 1:30 p.m., April 27, 1993 [*i.e.*, two hours after the Judge to whom this action was previously assigned granted the order of at-

---

11. Such submissions are also to cover the same issue as applicable to the Central Bank's accounts with Bankers Trust Company ($3,159.82)

and Chemical Bank ($10,885.02) described above.

tachment], where they shall then become subject to the Order of Attachment in an aggregate up to the amount of $30 million." (Notice of Mot. at 2.) On May 10, 1993, this Court granted plaintiff expedited discovery of the Republic and the Central Bank "as to assets of the Republic, or of any agency or instrumentality thereof (as 'agency or instrumentality of a foreign state' is defined in 28 U.S.C. § 1603(b)), or of the [Central] Bank, the *situs* of which property was in New York State at any time from and including April 16, 1993." *Weston Compagnie de Finance et d' Investissement, S.A. v. La Republic del Ecuador,* No. 93–2698, 1993 WL 244920, at *1, 1993 U.S.Dist.LEXIS 6067, at *1 (S.D.N.Y. May 10, 1993).

Plaintiff has not shown, to date, that any defendant with notice of the order of attachment has transferred funds in violation thereof.[12] Absent such a showing, specifically identifying funds subject to prejudgment attachment so transferred, the second branch of plaintiff's motion is denied. "The FSIA would become meaningless if courts could eviscerate its protections merely by denominating their restraints as injunctions against the negotiation or use of property rather than as attachments of that property." *S & S Machinery Co. v. Masinexportimport,* 706 F.2d 411, 418 (2d Cir.), *cert. denied,* 464 U.S. 850, 104 S.Ct. 161, 78 L.Ed.2d 147 (1983). Plaintiff may renew the motion upon a proper showing.

### 7.

The Central Bank's motion for an increase of the undertaking required of plaintiff is denied, without prejudice, however, to renewal should further substantial attachments be made.

### 8.

Trial will commence on August 9, 1993 at 11:00 A.M., and be continued on August 10 and 11 and such other days in August as may be scheduled as necessary. The parties are

referred to this Court's individual Rules of Practice and Civil Pretrial Order and Trial Procedures (Amended, Effective 3/1/92), copies of which may be obtained from chambers. The joint pretrial order, trial memoranda, and proposed findings of fact and conclusions of law, and copies of exhibits and deposition testimony to be offered, may, however, be delivered to chambers not later than August 4, 1993.

The case is referred to Magistrate Judge Buchwald to supervise discovery. The parties are directed to cooperate to the fullest extent possible in expediting and completing discovery in light of the above trial date.

### 9.

The present order is stayed through June 16, 1993 at 5:00 P.M. in order to allow any party to make such application as it may wish to make to the Court of Appeals.

SO ORDERED.

---

12. A transfer of the balance in the Central Bank's account with Swiss Bank Corporation made subsequent to the grant of the order of attachment has, it appears, been rectified by the Central Bank's instruction that the balance be returned. (*See* Sanchez Aff.Ex.F.)

It should be noted that the Judge to whom this case was previously assigned did not grant the broad injunctive relief sought by plaintiff on its *ex parte* application.