**NML CAPITAL, LTD. and EM Ltd., Plaintiffs–Appellees,**

v.

**BANCO CENTRAL DE LA REPÚBLICA ARGENTINA, Interested Non–Party–Appellant,**

**The Republic of Argentina, Defendant–Appellant.**

Docket Nos. 10–1487–cv(L), 10–1488–cv(CON), 10–1493–cv(CON), 10–1507–cv(CON), 10–1510–cv(CON), 10–1524–cv(CON), 10–1529–cv(CON), 10–1545–cv(CON), 10–1603–cv(CON), 10–1629–cv(CON).

United States Court of Appeals, Second Circuit.

Argued: Aug. 25, 2010.

Decided: July 5, 2011.

Jonathan I. Blackman (Carmine D. Boccuzzi, Christopher P. Moore, Rahul Mukhi, on the brief), Cleary Gottlieb Steen & Hamilton LLP, New York, NY, for Defendant–Appellant The Republic of Argentina.

Joseph E. Neuhaus (Laurent S. Wiesel, Michael J. Ushkow, Taly Dvorkis, on the brief), Sullivan & Cromwell LLP, New York, NY, for Interested Non–Party–Appellant Banco Central de la República Argentina.

Theodore B. Olson, Gibson, Dunn & Crutcher LLP, Washington, DC (Matthew D. McGill, Jason J. Mendro, Gibson, Dunn & Crutcher LLP, Washington, DC; Robert A. Cohen, Dennis H. Hranitzky, Dechert LLP, New York, NY, on the brief), for Plaintiff–Appellee NML Capital, Ltd.

David W. Rivkin (John B. Missing and Suzanne M. Grosso, on the brief), Debevoise & Plimpton LLP, New York, NY, for Plaintiff–Appellee EM Ltd.

Michele Kalstein, Counsel and Vice President (Thomas C. Baxter, Jr., General Counsel, on the brief), The Federal Reserve Bank of New York, New York, NY, for amicus curiae The Federal Reserve Bank of New York in support of Appellants.

John D. Clopper, Assistant United States Attorney (Preet Bharara, United States Attorney, Benjamin H. Torrance, Assistant United States Attorney, United States Attorney's Office for the Southern District of New York, New York, NY; Tony West, Assistant Attorney General, Douglas N. Letter, Sharon Swingle, United States Department of Justice, Washington, DC; George W. Madison, General Counsel, Department of the Treasury, Washington, DC; Harold Hongju Koh, The Legal Adviser, Department of State, Washington, DC, on the brief), for amicus curiae United States of America in support of Appellants.

Hal S. Scott, Program on International Financial Systems, Harvard Law School, Cambridge, MA, amicus curiae in support of Appellees.

Before: MINER, CABRANES, and STRAUB, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge:

■ The question presented is whether certain assets held in the United States in an account of interested non-party-appellant Banco Central de la República Argentina ("BCRA") at the Federal Reserve Bank of New York ("FRBNY") are im-

mune from attachment and execution under the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1602 *et seq.* ("FSIA").[1] For ease of reference, we refer to those assets as the "FRBNY Funds."

In order to decide whether the FRBNY funds are immune from attachment or execution, we must first decide two questions of first impression in this Circuit: (1) does the exercise of sovereign immunity for "property ... of a foreign central bank or monetary authority held for its own account" pursuant to 28 U.S.C. § 1611(b)(1)[2] depend upon whether the central bank or monetary authority is entitled to a presumption of independence under *First National City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) ("*Bancec*"); and (2) what is the proper meaning of the phrase "property ... of a foreign central bank or monetary authority held for its own account" in § 1611(b)(1)?

## BACKGROUND

This is the parties' second appearance before this Court to litigate whether the FRBNY Funds are immune from attach-

ment under the FSIA. *See EM Ltd. v. Republic of Argentina,* 473 F.3d 463 (2d Cir.2007) ("*EM I* "). We assume familiarity with the facts and procedural history of the dispute as recounted in *EM I,* as well as knowledge of the preeminence of the Republic of Argentina ("Argentina" or the "Republic") in the sorry history of defaults on sovereign debt. *Id.* at 466 n.2 (recording Argentina's "many contributions to the law of foreign insolvency through its numerous defaults on its sovereign obligations, as well as through ... a diplomacy of default").

## A.

In December 2001, the President of Argentina declared a temporary moratorium on principal and interest payments on more than $80 billion of public external debt—that is, money the Republic had borrowed from foreign creditors. Since the 2001 default, Argentina has not made principal or interest payments on its non-performing debt. Plaintiffs-appellees EM Ltd. and NML Capital, Ltd. are beneficial owners of debt instruments on which the Republic has defaulted. The Republic has

---

**1.** Although, as a general matter, only a party of record may appeal a judgment, *United States ex rel. Louisiana v. Jack,* 244 U.S. 397, 402, 37 S.Ct. 605, 61 L.Ed. 1222 (1917), a non-party may appeal in certain circumstances "when the nonparty has an interest that is affected by the trial court's judgment." *Hispanic Soc'y v. New York City Police Dep't,* 806 F.2d 1147, 1152 (2d Cir.1986). BCRA is such a party. *See, e.g., Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,* 313 F.3d 70, 81 (2d Cir.2002) (recognizing the standing of non-party Republic of Indonesia to appeal a judgment that allowed a party to garnish property allegedly owned by the Republic); *United States v. Int'l Bhd. of Teamsters,* 931 F.2d 177, 183–84 (2d Cir.1991) (recognizing the standing of non-party union affiliates whose practices were directly affected by an order approving a settlement between the government and the union). Indeed, plaintiffs do not contest BCRA's

standing. *See Palmieri v. Allstate Ins. Co.,* 445 F.3d 179, 188 (2d Cir.2006) (issues not raised on appeal are treated as waived).

**2.** 28 U.S.C. § 1611(b)(1) provides, in relevant part:

> (b) Notwithstanding the provisions of section 1610 of this chapter, the property of a foreign state shall be immune from attachment and from execution, if—
> (1) the property is that of a foreign central bank or monetary authority held for its own account, unless such bank or authority, or its parent foreign government, has explicitly waived its immunity from attachment in aid of execution, or from execution, notwithstanding any withdrawal of the waiver which the bank, authority or government may purport to effect except in accordance with the terms of the waiver.

*See also* note 14, *post* (providing the text of 28 U.S.C. § 1610(a) in relevant part).

waived its right to assert its sovereign immunity from suit in any claims arising under those instruments.[3] *See* Part C(v) at 195–96, *post.*

Plaintiffs chose not to participate in restructuring proposals in which the Republic offered to exchange debt instruments on which it defaulted in 2001 for new debt instruments with modified, and generally less favorable, terms.[4] Instead, plaintiffs have sought to recover their investments through litigation against the Republic in the federal courts of the United States;[5] they now hold unsatisfied final judgments in the United States District Court for the Southern District of New York for nearly $2.4 billion.[6] Plaintiffs seek to attach and

**3.** The Republic concedes that in the Fiscal Agency Agreement governing the debt instruments owned by plaintiffs it clearly and unambiguously waived its right to assert its sovereign immunity from suit in claims regarding those instruments. *See* Republic Br. 18 ("In the FAA, the Republic waived its immunity to suit and consented to the jurisdiction of New York courts in connection with claims based upon the bonds."); *see also NML Capital, Ltd. v. Republic of Argentina,* 05 Civ. 2434 (S.D.N.Y. Feb. 28, 2005), Singer Decl. Ex. A, Fiscal Agency Agreement between The Republic of Argentina and Bankers Trust Company, Fiscal Agent (Oct. 19, 1994) ("The Republic hereby irrevocably waives and agrees not to plead any immunity from the jurisdiction of any such court to which it might otherwise be entitled in any action arising out of or based on the securities or this Agreement by the holder of any Security."); Joint Appendix ("JA") Vol. I at 226. All of the instruments on which plaintiffs have sued were issued pursuant to the Republic's 1994 Global Note Program, which is governed by the October 19, 1994 Fiscal Agency Agreement. Republic Br. 18.

**4.** On January 14, 2005, Argentina launched a "global exchange offer" pursuant to which foreign creditors holding debt instruments on which the Republic had defaulted in 2001 could voluntarily exchange their non-performing bonds for new securities. When the 2005 Global Exchange Offer closed on February 25, 2005, the aggregate outstanding foreign private debt that had been tendered totaled approximately 76 percent, representing a par value of $62.3 billion. On April 30, 2010, while this appeal was pending, Argentina launched a second global exchange offer, the 2010 Global Exchange Offer, aimed at replacing the outstanding non-performing debt that had not already been tendered in 2005. When that Offer closed on June 30, 2010, the aggregate amount of securities in default tendered (along with a similar offer conducted concurrently by Argentina in Japan), totaled approximately $12.2 billion, representing approximately 67 percent of the aggregate outstanding non-performing debt. As a result of the 2005 and 2010 Global Exchange Offers, Argentina has restructured over 91 percent of the foreign debt on which it defaulted in December 2001. *See* Republic of Argentina, Annual Report for Foreign Governments and Political Subdivisions 16–17 (Securities and Exchange Commission Form 18–K) (Oct. 1, 2010) (available at http://www.sec.gov/Archives/edgar/data/914021/000090342310000550/roa–18k_0927.htm) (last visited June 2, 2011).

**5.** It is undisputed that in the terms and conditions governing each of the securities at issue in this case the Republic agreed to submit to "the jurisdiction of any New York state or federal court sitting in the Borough of Manhattan, The City of New York ... over any suit, action, or proceeding against it or its properties, assets or revenues with respect to the Securities of this Series or the Fiscal Agency Agreement ... except with respect to any actions brought under the United States federal securities laws."

**6.** On October 27, 2003, a final judgment of $724,801,662.56—the par value of the principal interest owed on the 10.000% New AR$ Global Bond due September 19, 2008, ISIN #XS0130278467—was entered against the Republic in favor of EM Ltd. *EM Ltd. v. Republic of Argentina,* No. 03 Civ. 2507, 2003 WL 22454934 (S.D.N.Y. Oct. 27, 2003), *aff'd,* 382 F.3d 291 (2d Cir.2004). As of January 11, 2010, that judgment had accrued post-judgment interest of almost $61 million, bringing the total value of the judgment to $785,778,299.98. Restraining Order, *EM Ltd. v. Republic of Argentina,* No. 03 Civ. 2507 (S.D.N.Y. Jan. 13, 2010).

restrain the FRBNY Funds in a BCRA account at FRBNY in aid of execution of those judgments.

As its name suggests, BCRA was founded in 1935 as "[t]he Central Bank of the Argentine Republic," *see* Law No. 24,-144/92, Ch. I, § 1 (Oct. 22, 1992, as amended) ("BCRA Charter"); JA Vol. V at 763. It is, by statute, "a self-administered institution of the [Argentine] State," charged with acting as the Republic's financial agent and as depository and agent for the Republic before international monetary, banking, and financial entities, as well as with regulating the Argentine banking system and financial sector. BCRA Charter, Arts. 3–4, 17–18, 21–22, 25, 28–29; JA Vol. V at 763, 767–68, 770–71. Pursuant to its "primar[y]" responsibility to "maintain the value of legal tender" in Argentina, BCRA Charter, art. 3, BCRA is "exclusively entrusted with the issuance of banknotes and coins in the Argentine Nation," *id.* at art.

30, and authorized to "invest a portion of its external assets in deposits or any other interest[-]bearing transaction with any foreign banking institution ... [,]" *id.* at art 33.

Like many central banks around the world, BCRA maintains a foreign central bank account at the FRBNY in which, among other things, it manages dollar-denominated reserve holdings.[7] The FRBNY Funds at issue in this case refer to the funds held in BCRA's account on December 30, 2005. By stipulation, the parties have provided a detailed account of the sources of those funds.[8] *See generally EM Ltd. v. The Republic of Argentina,* 720 F.Supp.2d 273, 289–92 (S.D.N.Y.2010) (discussing the sources of the FRBNY Funds).

Over the course of the three-month period preceding December 30, 2005, BCRA transferred approximately $2.1 billion from its account at the FRBNY to its account at

---

As of February 4, 2011, the Republic owed $1,612,960,236.98 of principal and post-judgment interest to NML Capital, Ltd. pursuant to a final judgment for the recovery of so-called "Floating Rate Accrual Notes," which became due and payable on April 10, 2005. *See* Order of Attachment, *NML Capital, Ltd. v. Republic of Argentina,* No. 06 Civ. 6466 (S.D.N.Y. Feb. 18, 2011) (aggregating a December 18, 2006 judgment in No. 03 Civ. 8845 ($62,830,391.32), two May 29, 2009 judgments in No. 05 Civ. 2434 ($2,341,-379.51) and No. 06 Civ. 6466 ($4,410,819.85), and two additional actions not at issue in this appeal).

7. FRBNY provides accounts in which approximately 250 foreign central banks and monetary authorities manage foreign exchange reserve holdings and other property. As of December 31, 2009, the balances in these accounts totaled nearly $3 trillion, representing more than half of the worldwide U.S. dollar-denominated reserves. FRBNY *Amicus* Br. 3. According to FRBNY, in 2009 foreign official reserves invested in U.S. Treasury securities through foreign central bank and monetary authority accounts at FRBNY represented approximately 30 percent of the

marketable outstanding debt of the United States. *Id.*

8. The parties' stipulation indicates that between October 1 and December 30, 2005, a time period of particular relevance as discussed below, FRBNY Funds were principally derived from four types of transactions. First, BCRA requires that Argentine banks maintain certain cash reserves, called *efectivo minimo,* on deposit at BCRA. Second, BCRA used its FRBNY account to provide foreign exchange transaction services to domestic Argentine banks, including currency settlement services. Third, BCRA used the FRBNY account to transfer funds on behalf of the Republic to and from certain international organizations and multilateral fora to which the Republic is a party, to and from Argentine embassies and missions abroad, and to certain foreign business service providers for expenses incurred by the Republic, including the law firm representing the Republic in this case. Fourth, and finally, BCRA used the FRBNY account to make payments of U.S. dollar-denominated operational expenses, such as the purchasing of currency paper and BCRA's subscription to Bloomberg news service. *EM Ltd.,* 720 F.Supp.2d at 303.

the Bank for International Settlements ("BIS").[9] *Id.* at 290. This followed a general trend during the period between 2001 and 2005, in which—wholly apart from the intra-day transfers necessary to effect transactions performed out of its FRBNY account—BCRA held more and more of its U.S. dollar-denominated foreign exchange reserves outside of the United States, *i.e.*, beyond the jurisdictional reach of the District Court.[10]

This reduction was attributable to two principal causes. First, as economic conditions in Argentina deteriorated leading up to and in the aftermath of the 2001 default, large quantities of U.S. dollars—in excess of $20 billion—were withdrawn from the Argentine banking system. In an effort to increase liquidity and prevent further economic damage in Argentina, BCRA spent billions of U.S. dollars buying Argentine pesos to defend (*i.e.*, prop up) the value of the peso. This policy depleted BCRA's dollar-denominated foreign exchange reserves. For example, at the beginning of 2001, BCRA's dollar-denominated international reserves totaled $25.1 billion; two years later the reserves totaled $8.3 billion. Basco Decl. ¶¶ 13–14 (March 14, 2005); JA Vol. V at 256.

Second, BCRA transferred the majority of its remaining dollar-denominated reserves out of the United States to "more protective jurisdictions"—in the view of BCRA—like the BIS, "as a preventive measure against possible wrongful attachment efforts by creditors of the Republic." Basco Decl. ¶ 18 (March 14, 2005); JA Vol. V at 258. BIS deposits are protected from attachment under The Hague Convention of 1930, 104 L.N.T.S. 441 (Jan. 20, 1930) (*available at* http://www.bis.org/about/convention-en.pdf) (establishing the BIS); the Protocol Regarding the Immunities of the Bank for International Settlements, 197 L.N.T.S. 31 (July 30, 1936) (*available at* http://www.bis.org/about/protoc.pdf); and the Agreement between the Swiss Federal Council and the Bank for International Settlements to determine the Bank's legal status in Switzerland, Feb. 10, 1987, amended Jan. 1, 2003 (*available at* http://www.bis.org/about/headquart-en.pdf). According to the BCRA official responsible for open market operations, in light of temporary attachments by U.S. federal courts, which were ultimately vacated in 1999, the protections offered to BIS account holders were deemed by BCRA to be more secure in circumstances in which "an attachment of any significant portion of BCRA's international reserves . . . would quite literally have caused the collapse of the Argentine peso with incalculable effects on the Republic's economy, social order and political stability." Basco Decl. ¶ 19 (March 14, 2005); JA Vol. V at 257–59.

As a result of the transactional activity in BCRA's account at FRBNY and the transfers out of the FRBNY account to the BIS, at the close of business on December 30, 2005—when plaintiffs moved, for the first time, to attach the FRBNY Funds—BCRA maintained approximately $105 million in its account at the FRBNY. *See EM Ltd.*, 720 F.Supp.2d at 303.

We now turn to the procedural history of plaintiffs' attachment efforts over those funds.

---

9. In addition to its account at FRBNY, BCRA maintains at least one U.S. dollar-denominated account at the BIS in Basel, Switzerland. *See EM Ltd.*, 720 F.Supp.2d at 288.

10. In September 2001, before Argentina's sovereign debt default, BCRA held $4.2 billion in its FRBNY account and $10.2 billion at other commercial banks in the United States. By December 2003, the FRBNY account had a cash deposit of $500 million; all of the other accounts had been emptied. While the running balance in the FRBNY account reached $1 billion at various points in 2004, by the fall of 2005 it was reduced to approximately $200 million.

## B.

On December 30, 2005, plaintiffs sought *ex parte* orders of pre-judgment attachment and post-judgment restraint over certain BCRA assets, including the FRBNY Funds. In their motions (the "2005 motions"), plaintiffs argued that two Emergency Decrees of Argentine President Néstor Kirchner (the "Kirchner Decrees"), designed to facilitate the repayment of the Republic's debt to the International Monetary Fund ("IMF"), had the effect of transferring ownership of certain BCRA assets, including the FRBNY Funds, from BCRA to the Republic.[11] That is, plaintiffs claimed that title to the "Unrestricted Reserves" had been transferred from BCRA to the Republic when the Republic rendered them available to repay the Republic's debt to the IMF, pursuant to the Kirchner Decrees. Because, according to plaintiffs, the Kirchner Decrees subjected to attachment "any portion of the reserves held by [BCRA] anywhere in the world . . . unless and until the attachments became so large that they exceeded the Unrestricted Reserves," the FRBNY Funds, which were not explicitly excluded from the Unrestricted Reserves, were allegedly subject to execution. *See EM I*, 473 F.3d at 475. As we noted in *EM I*,

[e]ven though only $8.4 billion in reserves were reclassified as Unrestricted Reserves pursuant to the [Kirchner] Decrees, under plaintiffs' theory, *all* $26.8 billion in the various BCRA accounts around the world would be subject to attachment (until the attached funds reach $8.4 billion) because all that money would be *potentially* designated as Unrestricted Reserves—*i.e.*, because it is unclear *which* $18.4 billion would be classified as that necessary to back the monetary base, and which $8.4 billion ($26.8 billion minus $18.4 billion) would be classified as "Unrestricted Reserves."

*Id.* at 475 n.11 (emphasis in original).

Plaintiffs obtained attachment and restraining orders from Judge Barbara S. Jones, sitting in Part I. *See* Standing Order of the Southern District of New York Setting Forth Rules for the Division of Business Among District Judges, at Rule 3(b)(ii) (Mar. 23, 2011) (*available at* http://www.nysd.uscourts.gov/rules/Final_-_March_2011.pdf) (last visited July 1, 2011) (motions for "emergency matters in civil cases" presented to the district judge sitting in "Part I"); *see also EM I*, 473 F.3d at 468–9 (discussing the procedure for execution under New York law and the FSIA).

---

11. On December 15, 2005, President Kirchner issued two emergency Executive Decrees intended to facilitate the early repayment of the Republic's $9.8 billion in outstanding debt to the IMF. *See* Cohen Decl., Ex. 2, (Dec. 30, 2005); JA Vol. V at 377. Decree 1599/2005 permitted the use of BCRA reserves in excess of those needed to back the Republic's monetary base—referred to as "Unrestricted Reserves," *see* Rivera Decl. ¶ 5 (Nov. 28, 2006); JA Vol. II at 627—to be used "to repay obligations due to international financial entities." Decree 1599/2005 Art. 1 (amending Law 23,928 Art. 4); JA Vol. III at 442. Decree 1601/2005 instructed that the Republic's debt to the IMF be repaid out of the "unrestricted reserves" created by Decree 1599/2005. JA Vol. II at 627. On December 29, 2005, the Ministry of Economy and Production ordered BCRA to repay the IMF loan ahead of schedule pursuant to the IMF Decrees. Decree 1601/2005 Art. 1; JA Vol. III at 448. On January 3, 2006, the Republic's debt to the IMF was repaid by BCRA using BCRA's assets by order of the Ministry of Economy and Production pursuant to the IMF Decrees. In exchange, BCRA received a non-transferable note from the Republic. *Id.; see generally EM I*, 473 F.3d at 468 (discussing Argentina's early repayment of its 2003 IMF loan).

On cross-motions by the parties to confirm and vacate the attachments and restraints, Judge Thomas P. Griesa, to whom these cases had been assigned in the normal course, vacated the amended notices.[12] In a January 12, 2006 opinion from the bench, the District Court concluded that the issuance of the Kirchner Decrees had no legal effect on the ownership of the FRBNY Funds. Moreover, the District Court concluded that FSIA § 1611(b) rendered the FRBNY Funds immune from attachment and execution because the waiver in the terms and conditions of the Fiscal Agency Agreement governing the bonds did not explicitly waive BCRA's immunity as required under the FSIA. *See EM I*, 473 F.3d at 470–71 (discussing the District Court's order vacating the attachment and restraining notices). The District Court certified the January 12, 2006 order for appeal pursuant to 28 U.S.C. § 1292(b).[13] *Id.*

In *EM I*, we held that "the [Kirchner] Decrees did not alter property rights with respect to the FRBNY Funds," 473 F.3d at 475, and affirmed the order of the District Court vacating the amended notices entered by the Part I judge. Both before and after the Kirchner Decrees, the FRBNY Funds were held in BCRA's account at FRBNY and therefore were entitled to the presumption under New York law that BCRA has title to that property.

*Id.* at 473–74 (citing *Karaha Bodas Co.*, 313 F.3d at 86 ("Under New York law, the party who possesses property is presumed to be the party who owns it. When a party holds funds in a bank account, possession is established, and the presumption of ownership follows.") (citations omitted)); *see also Kolodziejczyk v. Wing*, 261 A.D.2d 927, 689 N.Y.S.2d 825, 825 (4th Dep't 1999); *Perkins v. Guar. Trust Co.*, 274 N.Y. 250, 261, 8 N.E.2d 849 (1937). We therefore rejected plaintiffs' argument that the Kirchner Decrees had the effect of changing the legal status of the FRBNY Funds, much less the entire Unrestricted Reserves. *EM I*, 473 F.3d at 473–74.

Having concluded that plaintiffs' arguments had run aground, we paused in *EM I* to note that "[t]o the extent that plaintiffs' claim on the FRBNY Funds is based on the Republic's control over BCRA, as demonstrated by the [Kirchner] Decrees, plaintiffs have failed to avail themselves of well-established legal principles that might permit attachment." *Id.* at 476 (internal citation omitted). That is, we suggested that, under *Bancec*, if plaintiffs were to argue that BCRA is either "so extensively controlled by [the Republic] that a relationship of principal and agent is created" or that recognizing its separate juridical status would "work fraud or injustice," *Bancec*, 462 U.S. at 629, 103 S.Ct. 2591, all of BCRA's assets might be considered at-

---

**12.** Subject to a January 9, 2006 Stipulation and Consent Order entered by the District Court, the attachment and restraining orders granted by the Part I judge were amended to require FRBNY to maintain in BCRA's account a sum not less than an amount equal to approximately $100 million—that is, an amount equal to 95 percent of the amount on deposit at the close of business on January 6, 2006. *See EM Ltd.*, 720 F.Supp.2d at 275.

**13.** 28 U.S.C. § 1292(b) provides, in relevant part:

When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order. . . .

tachable interests of the Republic. Nevertheless, we observed that "[t]he separate juridical status of BCRA is not disputed by plaintiffs, and plaintiffs expressly elected not to argue in support of attachment that BCRA's separate juridical status should be disregarded because BCRA is the alter ego of the Republic." *EM I*, 473 F.3d at 479.

Finally, after holding that plaintiffs' claims also failed because the FRBNY Funds were not "used for commercial activity" within the meaning of the FSIA and were thus immune from attachment under 28 U.S.C. § 1610(a),[14] *EM I*, 473 F.3d at 481–85, we turned to the application of § 1611(b)(1) to the facts of the dispute as presented at that point in the litigation. Recognizing that the parties had asked us to resolve competing interpretations of the phrase "held for its own account" in 28 U.S.C. § 1611(b)(1), we observed that because "plaintiffs have not established their right to attach the FRBNY Funds," whether those funds were immune from attachment under § 1611 was irrelevant. *EM I*, 473 F.3d at 485. We nonetheless intimated that, inasmuch as acting as the Republic's fiscal agent in the repayment of its IMF debt was a traditional central bank activity, the plain meaning and legislative history of § 1611(b)(1) supported the proposition that funds used or held in connection with traditional central banking activities were considered to be "held for

BCRA's own account" under § 1611(b)(1). *Id.* at 485 n.22 (citing H.R.Rep. No. 94–1487 ("FSIA House Report") at 31 (1976), *reprinted in* U.S.C.C.A.N. 6604, 6630, 1976 WL 14078) (quotation marks omitted). Thus, we concluded, "even if BCRA had decided to use the FRBNY Funds to repay the IMF, the funds would continue to be held for BCRA's 'own account,'" and thus would be immune from attachment under FSIA § 1611(b)(1). *Id.* (quoting § 1611(b)(1)). We therefore affirmed the order of the District Court vacating the amended attachment and restraining notices. *Id.* at 486–87.

## C.

In September 2006, while *EM I* was pending before our Court, plaintiffs commenced this action seeking a declaratory judgment that, pursuant to *Bancec*, BCRA was liable for the debts of the Republic. Specifically, plaintiffs argued that the Republic's consistent disregard for BCRA's independence had vitiated any presumption of separateness to which BCRA was entitled, transforming the BCRA into an alter-ego of the Republic. Indeed, according to plaintiffs, the Republic had "exploited the legal fiction of [that] independence unjustly and fraudulently to avoid paying creditors like [plaintiffs]." Complaint at ¶ 18, *EM Ltd. v. Republic of Argentina*, No. 06 Civ. 7792 (S.D.N.Y. Sept. 25, 2006); JA Vol. I at 616.[15]

---

**14.** 28 U.S.C. § 1610(a) provides, in pertinent part, as follows:

    (a) The property in the United States of a foreign state ... used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State ... if—

    (1) the foreign state has waived its immunity from attachment in aid of execution or from execution either explicitly or by implication, notwithstanding any withdrawal of the waiver the foreign state may purport to

effect except in accordance with the terms of the waiver....

**15.** As the District Court recognized, by reframing the focus of its argument beyond the Kirchner Decrees, plaintiffs expanded the scope of our inquiry considerably, bringing into the record the Republic's disregard of BCRA's ostensibly independent monetary policy autonomy in order to accumulate "unsterilized" foreign exchange reserves; the Republic's abuse of its appointment power in order to replace BCRA leadership unwilling to do its bidding; and the Republic's interference

Rather than seek new orders of attachment and restraint on the FRBNY Funds under their new theory of liability, plaintiffs agreed to an amended Stipulation and Consent Order of September 28, 2006, pursuant to which the terms of the January 9, 2006 Stipulation and Consent Order would remain in effect while plaintiffs' new claims were pending in the District Court and the earlier orders were considered by the Court of Appeals. Under the September 2006 Stipulation, the District Court agreed to consider plaintiffs' previous motions for attachment and restraint under their new legal theories (the *"Bancec* motions"); that is, the District Court agreed to apply the restraining and attachment notices underlying the 2005 motions—which were the subject of our decision in *EM I*—to the *Bancec* motions without requiring plaintiffs to file new requests for attachment and restraining notices. After concluding that plaintiffs' new claims were not barred under the doctrine of *res judicata,* the District Court granted the *Bancec* motions on April 7, 2010. *See EM Ltd.,* 720 F.Supp.2d at 304; *see also* Order, *EM Ltd. v. Republic of Argentina,* No. 03 Civ. 2507, Docket No. 380 at *3 (S.D.N.Y. Apr. 16, 2010) (granting plaintiffs' attachment motion).

with the BCRA's operational independence in order to ensure that the BCRA's reserves were beyond the reach of execution by foreign courts. *See EM Ltd.,* 720 F.Supp.2d at 295. All these actions, plaintiffs claim, were designed to use BCRA reserves to selectively pay some of the Republic's foreign creditors while allowing the Republic to avoid paying the obligations of other, less favored creditors.

We note, however, that unpacking the forces that shape the monetary policy decisions of a sovereign state is difficult, and while the record often permits us to discern with confidence *what* happened, it does not always permit us to determine *why* a particular decision was made, much less whether it was effected by one political entity against its

The District Court drew four conclusions with respect to the merits of plaintiffs' claims. First, the District Court held, under the test established in *Bancec,* that the Republic's disregard for BCRA's independence justified the conclusion that BCRA was not entitled to a presumption of juridical separateness. *EM Ltd.,* 720 F.Supp.2d at 300. In *Bancec,* the Supreme Court explained that "where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created, we have held that one may be held liable for the actions of the other." *Bancec,* 462 U.S. at 629, 103 S.Ct. 2591. As the District Court explained,

> BCRA did the Republic's bidding in two important respects. First, BCRA issued the pesos in sufficient amounts to purchase billions of U.S. dollars. Second, BCRA took [those dollars] and paid the Republic's debt to the IMF.

This demonstrated that the Republic could draw on the resources of BCRA at will. The Republic ignored the mandate of BCRA's charter, which provided that BCRA would not be subject to any order or instruction of the National Executive in connection with the implementation of monetary and financial policy. The management of BCRA posed no obsta-

will and at the behest of another. Like the District Court, although we consider the entire record on appeal, we focus on those policy decisions, like the Kirchner Decrees, for which we have the highest degree of confidence that the record is sufficiently developed to permit an informed judgment. *See, e.g., EM Ltd.,* 720 F.Supp.2d at 299 (noting that while "[t]here is evidence that, beginning in late 2004, the Republic directed BCRA to issue increased amounts of pesos to purchase U.S. dollars, thus lowering the value of the peso in a manner favoring certain portions of the electorate ... [t]he [District Court does] not rely to any great degree on this circumstance, because the details are not clear from the record.").

cles to the Republic's use of the resources of BCRA exactly as the Republic wished. The Republic's control in this regard was complete.

*EM Ltd.*, 720 F.Supp.2d at 300. Accordingly, the District Court determined that "[a]s of the end of 2005, when the attachments and restraints in this case were issued, the funds of BCRA were in effect the funds of the Republic." This was, the Court cautioned, not the result of a formal change of title as plaintiffs had previously argued, but the result of the kind of control referred to in *Bancec*. *Id.*

Second, the District Court concluded that although the terms and conditions governing the bonds held by plaintiffs gave assurances that the rights of the bondholders—that is, plaintiffs—"may be enforced" in the event of a default, by ensuring that it had no assets within the jurisdiction of the District Court, the Republic had created "a path to the judgments, [but with] nothing approaching an accessible path to payment enforcement." *Id.* at 301. Indeed, focusing specifically on BCRA's immunity, the District Court observed that "[w]hat the bonds do not say is that the law of this jurisdiction—the Foreign Sovereign Immunities Act—imposes severe restrictions upon the ability of a creditor of the Republic to obtain an attachment or execution." *Id.* at 301. Accordingly, the District Court held that—with specific regard to the FRBNY Funds—the Republic had perpetrated precisely the sort of "fraud and injustice" that the Supreme Court in *Bancec* said warranted setting aside the presumption of juridical separateness that might otherwise immunize certain funds. *Id.* at 302.

Third, the District Court held that the FRBNY Funds were property used for commercial activity in the United States within the meaning of 28 U.S.C. § 1610(a) and (d) because they were used for traditional banking purposes that are clearly "the type of actions by which a private party engages in 'trade and traffic or commerce.' " *Id.* at 303 (citing *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992)). It therefore did not matter "what purpose BCRA was using the funds for," only that the "type of activity"—maintenance of a bank account with deposits and withdrawals, with the ability to earn a certain amount of income on balances— was "commercial" in nature. *Id.*

Finally, the District Court held that FSIA § 1611(b)(1), *see* note 2, *ante*, did not prohibit the attachment of the FRBNY Funds. Although the District Court recognized that the FRBNY Funds fell within the explicit terms of § 1611 because "the account at the FRBNY was in the name of BCRA, and there was no specific waiver of immunity as to this account by BCRA or the Republic," *EM Ltd.*, 720 F.Supp.2d at 303, it reasoned that "if there are weighty and sufficient reasons to conclude that the funds in the account were in reality the funds of the Republic, as this court has held, it would be entirely anomalous to hold that the funds belonged to BCRA and were 'held for its own account,' within the meaning of § 1611." *Id.* at 303–04. In other words, the District Court concluded that a determination under *Bancec* that the BCRA is not entitled to the presumption of juridical separateness from the Republic overrode the immunity that might otherwise be afforded under § 1611(b)(1). Accordingly, the Court concluded that the FRBNY Funds were "the property of the Republic," and that "the provisions of the FSIA, when properly applied, permitted [the] attachment[ ] and restraint [of the Funds]." *Id.* at 304.

Following the April 7, 2010 opinion in which the District Court announced its conclusions, the District Court issued an order of April 16, 2010, granting the *Bancec* motions and attaching and restraining

the FRBNY Funds. *EM Ltd. v. Republic of Argentina,* No. 03 Civ. 2507, Docket No. 380, at *3 (S.D.N.Y. Apr. 16, 2010). The Republic and BCRA appeal from that order and all associated orders of the District Court.

## DISCUSSION

### A.

As in *EM I,* we have appellate jurisdiction because this appeal was certified by the District Court pursuant to 28 U.S.C. § 1292(b). We agree that the District Court's ruling involves unresolved controlling questions of law and that an appeal would advance the termination of the litigation. *EM I, Ltd.,* 473 F.3d at 471; *see also Klinghoffer v. S.N.C. Achille Lauro Ed Altri–Gestione Motonave Achille Lauro in Amministrazione Straordinaria,* 921 F.2d 21, 23–25 (2d Cir.1990) (discussing the criteria for accepting jurisdiction in an appeal pursuant to § 1292(b)). We therefore grant plaintiffs' motion to hear the appeal pursuant to 28 U.S.C. § 1292(b).

Having accepted jurisdiction under § 1292(b), we need not consider whether jurisdiction would also be proper under 28 U.S.C. § 1292(a)(1), which grants appellate courts jurisdiction under the collateral order doctrine. *See Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 545–47, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949); *see also Karaha Bodas Co., L.L.C.,* 313 F.3d at 81 n.11 (considering appeal of orders related to attachment of assets of Indonesian national government and instrumentality under § 1292(b) without determining whether jurisdiction would also be proper under collateral order doctrine).

### B.

The threshold question on appeal is whether consideration of the September 2006 *Bancec* motions to attach the FRBNY Funds is barred under the doctrine of claim preclusion or issue preclu-

sion. Stated differently, we first ask whether the vacatur of the 2005 notices in *EM I* prevented plaintiffs from asserting a different theory of execution in the 2006 *Bancec* motions. The District Court held that it did not. *EM Ltd.,* 720 F.Supp.2d at 296. We agree.

### (i)

Whether or not a prior federal court judgment has preclusive effect in a subsequent action is a question of federal common law, *Taylor v. Sturgell,* 553 U.S. 880, 891, 128 S.Ct. 2161, 171 L.Ed.2d 155 (2008), which we review *de novo,* "accepting all factual findings of the district court unless clearly erroneous." *Chartier v. Marlin Mgmt., LLC,* 202 F.3d 89, 93 (2d Cir.2000).

### (ii)

The doctrine of claim preclusion "bars 'repetitious suits involving the same cause of action' once 'a court of competent jurisdiction has entered a final judgment on the merits.' " *United States v. Tohono O'Odham Nation,* —— U.S. ——, 131 S.Ct. 1723, 1730, 179 L.Ed.2d 723 (2011) (quoting *Commissioner v. Sunnen,* 333 U.S. 591, 597, 68 S.Ct. 715, 92 L.Ed. 898 (1948)). The doctrine is intended to proscribe "every matter that was offered and received to sustain or defeat a cause of action, as well as to any other matter that the parties had a full and fair opportunity to offer for that purpose," *Manhattan Eye Ear & Throat Hosp. v. N.L.R.B.,* 942 F.2d 151, 155–56 (2d Cir.1991) (citing *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979); 18 C. Wright, A. Miller & E. Cooper, Fed. Practice and Procedure § 4402, at 7 (1981)). In this circuit, we have laid out a four-factor test for claim preclusion, which examines whether the earlier action "was (1) a final judgment on the merits, (2) by a court of competent jurisdiction, (3) in a case involving the same parties or their privies, and

(4) involving the same cause of action." *In re Adelphia Recovery Trust,* 634 F.3d 678, 694 (2d Cir.2011) (quoting *EDP Med. Computer Sys., Inc. v. United States,* 480 F.3d 621, 624 (2d Cir.2007)).

■ As we observed in *Dayco Corp. v. Foreign Transactions Corp.,* "an order confirming or refusing to confirm an attachment is in no way final," and therefore the denial of "an application to confirm will not preclude a subsequent attachment proceeding where there has been an intervening change of circumstances." 705 F.2d 38, 39 (2d Cir.1983). Indeed, it is well-settled that judgment creditors can file successive attachment motions before final judgment has been entered in the underlying suit. *See Ladenburg v. Commercial Bank of Newfoundland,* 5 A.D. 219, 39 N.Y.S. 119, 120 (1st Dep't 1896); *accord Marvel Characters, Inc. v. Simon,* 310 F.3d 280, 286 (2d Cir.2002) ("no discernible difference" between the way in which New York courts apply claim preclusion principles and the way in which federal courts apply those principles). The District Court therefore correctly determined that the 2005 motions vacated by this Court in *EM I* were not final judgments on the merits. In the terminology of the common law that federal courts have supposedly retired, without a valid and final judgment into which plaintiffs' cause of action can be "merged," plaintiffs are not "barred" from bringing a successive claim under the same cause of action. *See Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 77 n.1, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984) ("Claim preclusion ... encompasses the law of merger and bar."); *see also* Restatement (Second) of Judgments § 18 (1982) (discussing the effect of merger and bar).

### (iii)

■ Issue preclusion bars "successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment." *New Hampshire v. Maine,* 532 U.S. 742, 748–49, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001). It "encompasses the doctrines earlier called 'collateral estoppel' and 'direct estoppel,'" *Bobby v. Bies,* 556 U.S. 825, 129 S.Ct. 2145, 2149 n.1, 173 L.Ed.2d 1173 (2009) (quotation marks and alteration omitted), and generally applies if: "(1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was 'actually litigated and actually decided,' (3) there was 'a full and fair opportunity for litigation in the prior proceeding,' and (4) the issues previously litigated were 'necessary to support a valid and final judgment on the merits,'" *Ali v. Mukasey,* 529 F.3d 478, 489 (2d Cir.2008) (quoting *Gelb v. Royal Globe Ins. Co.,* 798 F.2d 38, 44 (2d Cir.1986)).

■ BCRA argues that the same four issues—whether the Republic had an attachable interest in BCRA's reserves; whether the FRBNY Funds were being used for commercial activity under FSIA § 1610(a); whether the FRBNY Funds were immune from attachment under FSIA § 1611(b)(1); and whether the Republic's waiver of sovereign immunity in the Fiscal Agency Agreement included BCRA—are the subject of the 2005 motions and the *Bancec* motions and that plaintiffs had a full and fair opportunity to litigate these issues before the District Court. BCRA Br. 26. We disagree.

In disposing of plaintiffs' 2005 motions, the District Court considered whether the FRBNY Funds were attachable because the Kirchner Decrees had transferred title from the BCRA to the Republic. *See EM I,* 473 F.3d at 470 (discussing the District Court's oral decision of January 12, 2006). In the *Bancec* motions, on the other hand, the District Court was asked

to consider whether the FRBNY Funds were attachable because plaintiffs' had overcome the presumption of juridical separateness to which BCRA is ordinarily entitled under *Bancec*. While the ends may be the same—that is, both sets of motions ultimately asked the District Court to determine whether the FRBNY Funds are attachable interests of the Republic—the legal and factual issues presented in the two cases are very different. *See EM Ltd.*, 720 F.Supp.2d at 295 ("[B]oth the legal and factual issues involved in the [*Bancec* motions] go far beyond the legal and factual issues posed by the [2005 motions]."). As a result, because the issue at the heart of the *Bancec* motions was not litigated, much less decided, in *EM I*, 473 F.3d at 480, we cannot say that the *Bancec* motions raise issues "actually litigated and decided by a court of competent jurisdiction," *Ali*, 529 F.3d at 489, and would therefore be barred under the doctrine of issue preclusion.

\* \* \*

In sum, we therefore hold that the *Bancec* motions are not barred under the doctrines of claim preclusion or issue preclusion.

### C.

We now turn to the merits of this appeal: whether the FRBNY Funds are immune from attachment and execution under § 1611(b)(1).

### (i)

We review a district court's order of attachment or restraint for abuse of discretion. *Aurelius Capital Partners, LP v.*

*Republic of Argentina*, 584 F.3d 120, 129 (2d Cir.2009). A district court has abused its discretion if it has (1) "based its ruling on an erroneous view of the law," (2) made a "clearly erroneous assessment of the evidence," or (3) "rendered a decision that cannot be located within the range of permissible decisions." *Sims v. Blot*, 534 F.3d 117, 132 (2d Cir.2008) (citations and quotation marks omitted). We review a district court's legal conclusions under the FSIA *de novo*. *See Robinson v. Gov't of Malaysia*, 269 F.3d 133, 138 (2d Cir.2001); *see also EM I*, 473 F.3d at 472.

■■■■ The FSIA "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989). Because "subject matter jurisdiction ... depends on the existence of one of the specified exceptions to foreign sovereign immunity," a court may not exercise subject matter jurisdiction over the property of a foreign state defendant unless that property is subject to attachment under the FSIA. *Verlinden B.V. v. Cent. Bank of Nig.*, 461 U.S. 480, 493, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983); *see also Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 48 (2d Cir. 2010) (discussing a district court's subject matter jurisdiction over a foreign state pursuant to 28 U.S.C. § 1605).

### (ii)

The statutory framework for the attachment, arrest, and execution of foreign state property under the FSIA is relatively straightforward. Unless the property of a foreign state, as defined in § 1603(a),[16] is

---

**16.** 28 U.S.C. § 1603(a)–(b) provides that
(a) [a] "foreign state," except as used in section 1608 of this title, includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).

(b) An "agency or instrumentality of a foreign state" means any entity—
(1) which is a separate legal person, corporate or otherwise, and
(2) which is an organ of a foreign state or political subdivision thereof, or a majority

subject to one of the exceptions set forth in FSIA § 1610, it is immune from attachment, arrest, and execution pursuant to FSIA § 1609.[17] *See Saudi Arabia v. Nelson*, 507 U.S. 349, 355, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993). Moreover, even if § 1610 would otherwise bring foreign state property within the jurisdiction of a court, § 1611(b)(1) "overrides [the] exceptions" in § 1610, *see Banque Compafina v. Banco de Guatemala*, 583 F.Supp. 320, 321 (S.D.N.Y.1984), and provides that "the property of a foreign state shall be immune from attachment and from execution, if—(1) the property is that of a foreign central bank or monetary authority held for its own account." 28 U.S.C. § 1611(b)(i); *see generally De Letelier v. Republic of Chile*, 748 F.2d 790, 793 (2d Cir.1984) ("[U]nder [FSIA] § 1609 foreign states are immune from execution upon judgments obtained against them, unless an exception set forth in §§ 1610 or 1611 of the FSIA applies.").

### (iii)

The District Court's holding was predicated on the conclusion that immunity under § 1611(b)(1) is dependent on a central bank's independence. That is, if a central bank lacks sufficient independence to preserve the presumption of juridical separateness under *Bancec*, our analysis under the FSIA must, according to plaintiffs, "stop at [§ ] 1610," *see* Transcript of Oral Argument 40, because the property of the

Republic in the present matter is not entitled to the immunity conferred in § 1611(b)(1). As a result, after "disregarding the formal separateness of the Republic and BCRA and treating the [FRBNY F]unds in the hands of BCRA ... as the funds of the Republic," *EM Ltd.*, 720 F.Supp.2d at 302, the District Court determined under § 1610 that (1) the Republic had "made the requisite waivers of immunity as to *its* property ... [which] includ[es] the [FRBNY Funds]," *id.* at 302 (emphasis supplied); and (2) the FRBNY Funds should be considered "property [of the Republic] used for commercial activity in the United States," *id.* at 303. The District Court declined to conduct an analysis of the FRBNY Funds' immunity under § 1611 because "the [FRBNY Funds were] in fact not the property of BCRA held for its own account, but [were] the property of the Republic." *Id.* at 304.

■■■ We think that the District Court misread the FSIA when it concluded that a court facing the question of whether the assets of a central bank are attachable property under the FSIA must first decide whether the central bank is entitled to the presumption of independence from its parent state under *Bancec*. We hold that the plain language, history, and structure of § 1611(b)(1) immunizes property of a foreign central bank or monetary authority held for its own account without regard to

---

of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

We have previously determined that both Argentina and BCRA are "foreign states" within the meaning of § 1603(a). *See Weltover, Inc. v. Republic of Argentina*, 941 F.2d 145, 148 (2d Cir.1991), *aff'd*, 504 U.S. 607, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992). In addition,

the definition of a foreign state under § 1608, which provides for the service of process against a foreign state under the FSIA, is not relevant here.

17. 28 U.S.C. § 1609 provides, in full, that "[s]ubject to existing international agreements to which the United States is a party at the time of enactment of this Act[,] the property in the United States of a foreign state shall be immune from attachment[,] arrest[,] and execution except as provided in sections 1610 and 1611 of this chapter."

whether the bank or authority is independent from its parent state pursuant to *Bancec.* If foreign central bank property is immune from attachment under § 1611(b)(1), the fact that "a relationship of principal and agent [has been] created" between the foreign state and its central bank under *Bancec* is irrelevant, *see Bancec,* 462 U.S. at 629, 103 S.Ct. 2591. As discussed below, foreign central banks are not treated as generic "agencies and instrumentalities" of a foreign state under the FSIA; they are given "special protections" befitting the particular sovereign interest in preventing the attachment and execution of central bank property. *EM I,* 473 F.3d at 485. Plaintiffs cannot evade this statutory requirement by using *Bancec* to turn assets that would otherwise be considered property of a central bank held for its own account into property of the Republic that is not entitled to immunity.

### (a) The Text and Structure of § 1611(b)(1)

"We begin, as always, with the text of the statute." *Permanent Mission of India to United Nations v. City of New York,* 551 U.S. 193, 197, 127 S.Ct. 2352, 168 L.Ed.2d 85 (2007) (analyzing FSIA § 1605). Section 1611(b) provides in full:

(b) *Notwithstanding the provisions of section 1610 of this chapter,* the property of a foreign state shall be immune from attachment and from execution, if—

(1) the property is that of a foreign central bank or monetary authority held for its own account, unless such bank or authority, or its parent foreign government, has explicitly waived its immunity from attachment in aid of execution, or from execution, notwithstanding any withdrawal of the waiver which the bank, authority or government may purport to effect except in accordance with the terms of the waiver; or

(2) the property is, or is intended to be, used in connection with a military activity and

(A) is of a military character, or

(B) is under the control of a military authority or defense agency.

28 U.S.C. § 1611(b) (2006) (emphasis supplied).

First, the text of the statute provides that the only qualification for immunity under § 1611(b)(1) is whether the property of the central bank is "held for its own account." We are mindful that in interpreting the statute we must "give effect to Congress' choice of words, and understand that the text, as written," does not create an independence requirement for the immunity of central bank assets under the FSIA. *United States v. Wilson,* 503 U.S. 329, 342, 112 S.Ct. 1351, 117 L.Ed.2d 593 (1992); *see also Utah v. Evans,* 536 U.S. 452, 463, 122 S.Ct. 2191, 153 L.Ed.2d 453 (2002) ("[The Court] read[s] limitations on [its] jurisdiction to review narrowly.") (citing *Webster v. Doe,* 486 U.S. 592, 603, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988)).

Second, the plain language of the statute suggests that Congress recognized that the property of a central bank, immune under § 1611, might *also* be the property of that central bank's parent state. As the United States, appearing as *amicus curiae,* observes, "if Congress had intended to limit § 1611(b)(1) to independent central banks, one would have expected the introductory language of the subsection—'Notwithstanding the provisions of section 1610 of this chapter'—to refer only to § 1610(b), which provides for execution or attachment of the property of state agencies and instrumentalities, rather than to § 1610 as a whole." United States *Amicus* Br. 6–7. But § 1611(b)(1) refers to § 1610 in its entirety—including those provisions of § 1610 applicable only to foreign states. Therefore, the statute seems to anticipate

the possibility that property held by the central bank may also be property of the sovereign state.

In response to the government, plaintiffs contend that "when Congress chose to immunize the 'property of a foreign central bank' ... it had in mind the property of a government agency or instrumentality with *separate legal personhood*." Pls.' Supp. Br. at 6 (emphasis in original). The legislative history of § 1611(b)(1), however, belies this claim. In the House Report on the FSIA, upon which we relied in *EM I*, Congress explained that

> Section 1611(b)(1) provides for the immunity of central bank funds from attachment or execution. It applies to funds of a foreign central bank or monetary authority which are deposited in the United States and "held" for the bank's or authority's "own account"— *i.e.*, funds used or held in connection with central banking activities, as distinguished from funds used solely to finance the commercial transactions of other entities or of foreign states. If execution could be levied on such funds without an explicit waiver, deposit of foreign funds in the United States might be discouraged. Moreover, execution against the reserves of foreign states could cause significant foreign relations problems.

FSIA House Report 31, *reprinted in* 1976 U.S.C.C.A.N. 6604 at 6630;[18] *see also EM I*, 473 F.3d at 473 (referencing Paul L. Lee, *Central Banks and Sovereign Immunity*, 41 Colum. J. Transnat'l L. 327, 376 (2003) (noting that Section 1611(b)(1) appears to have been developed in order to avoid the "potential difficulties" that cen-

tral banks would be faced with if their assets were subject to attachment under the provisions of Section 1610(b))).

The FSIA House Report reflects Congress's understanding that while the "funds of [ ] foreign central banks" are managed through those banks' accounts in the United States, those funds are, in fact, "the reserves of [the] foreign state[s]" themselves. FSIA House Report 31, *as reprinted in* 1976 U.S.C.C.A.N. 6604 at 6630. In other words, the property of central banks deserves protection notwithstanding the fact that central banks may not have separate legal personhood. "By referring to the property of a foreign state and the property of a central bank interchangeably, Congress indicated its understanding that central bank property could be viewed as the property of a foreign state, and nonetheless be immune from attachment." *See* United States *Amicus Br*. 8.

### (b) Historical Context

Perhaps most convincingly, the historical backdrop against which the FSIA was passed forecloses the argument that a determination of agency liability under *Bancec* can render property attachable that is otherwise immune under § 1611(b)(1). As *plaintiffs'* expert observes, "[t]wenty years ago ... most central banks in the world functioned as departments of ministries of finance[,]" in which "the level of actual independence ... was usually lower than indicated in the law." Alex Cukierman, *Central Bank Independence and Monetary Policymaking Institutions—Past Present and Future*, 24 Eur. J. Pol. &

---

18. *See also* Sen. Judiciary Comm., Define Jurisdiction of U.S. Courts in Suits Against Foreign States, Sen. Rep. No. 1310, 94th Cong., 2d Sess. 8–9. As we observed in *Texas Trading & Mill. Corp. v. Federal Republic of Nigeria*, "[t]he House and Senate Committees filed identical reports, and references [herein] to

the House Report may be deemed to represent the views of the Senate Committee as well." 647 F.2d 300, 306 n.18 (2d Cir.1981), *overruled on other grounds by Frontera Res. Azer. Corp. v. State Oil Co. of Azer. Repub.*, 582 F.3d 393 (2d Cir.2009).

Econ. 722, 722 (2008). That statement, written in 2008, refers to a time in the mid-late 1970s just *after* the FSIA had been passed by Congress. Indeed, one account of the history of central banking describes an "alternating pattern" of central bank independence in which in "the period from the First World War to the 1970s ... there was a move to greater government control, and of more dependent central banks." Forrest Capie *et al.*, The Future of Central Banking 49 (1994); *see also* M.H. de Kock, Central Banking 327 (3d ed.1954) (recognizing the "pronounced trend toward State ownership and control of central banks" in the post-war era). *See generally id.* at 325–330.

Accordingly, when Congress passed the FSIA, it had no reason to believe that foreign central banks and monetary authorities would be independent of their parent states because, at that time, most were not. Moreover, Congress had reason to suspect that, as appears to be the case with Argentina, a central bank's actual degree of autonomy may not be entirely predictable based on its degree of juridical independence. In an environment in which Congress was worried that execution against foreign central bank deposits might "discourage[ ]" foreign states from depositing their reserves in the United States, *see* FSIA House Report 31, *reprinted in* 1976 U.S.C.C.A.N. 6604 at 6630; *see also EM I*, 473 F.3d at 473, it makes no sense to assume that Congress would enact a statute designed to prevent "significant foreign relations problems" which failed to immunize a significant portion of the central bank reserves in the United States at that time. *Id.*

Indeed, as BCRA and the Republic point out, by some calculations, the independence ranking that plaintiffs introduced into the record in support of their argument that BCRA is the "alter ego" of the Republic under *Bancec* renders BCRA

*more* independent than the Federal Reserve System, the central bank of the United States, and *more* independent than the Bank of England, the central bank of the United Kingdom. *See* BCRA and Republic Joint Reply Br. 40 (citing Simone Polillo & Mauro Guillen, *Globalization Pressures and the State: The Global Spread of Central Bank Independence*, 110 Am. J. Sociology 1764, 1781 (2005) (data *available at* http://www.management. wharton.upenn.edu/guillen/2009_docs/CBI_ index_updated.pdf)). Assuming, *arguendo*, that such rankings are relevant indicators of independence for the purpose of determining juridical status under *Bancec*, it is simply inconceivable that Congress would have designed a statute pursuant to which all of the assets of the United States Federal Reserve system could be treated as attachable interests of the United States (absent other principles of sovereign immunity). *See EM I*, 473 F.3d at 476 n.12 (stating same).

\*      \*      \*

We therefore conclude that § 1611(b)(1) immunizes foreign central bank property "held for its own account" without regard to the central bank's independence from its parent state; that is, we hold that the analysis of the immunity of a foreign central bank's property *begins* with § 1611(b)(1). There is no indication in the text, history, or structure of the FSIA that Congress intended to make the immunity of a central bank's property contingent on the independence of the central bank. The statute makes no reference to the independence or autonomy of a central bank or monetary authority. Moreover, the history of the FSIA and of the independence of central banks suggests that Congress understood the property of a foreign central bank to be deserving of immunity regardless of that bank's independence. Plaintiffs fail to convince us that an inde-

pendence requirement can be fairly read into the statute.

### (iv)

Having concluded that the immunity of the FRBNY Funds under the FSIA turns not on whether the BCRA is entitled to a presumption of independence from the Republic under *Bancec*, but on whether the funds are property of the BCRA "held for its own account" under § 1611(b)(1), we must now decide whether the FRBNY Funds meet that test.

The definition of the phrase "held for its own account" in § 1611(b)(1) is a matter of first impression in this Circuit. *See EM I*, 473 F.3d at 485 (declining to "decide which interpretation of § 1611(b)(1)'s 'held for its own account' language is correct"). The parties and *amici* propose three competing definitions.

First, BCRA argues that central bank property is "held for its own account" if that property is used for "traditional central banking activities." BCRA Br. 37. This appears to be the test adopted by Congress in the FSIA, *see* FSIA House Report 31, *reprinted in* 1976 U.S.C.C.A.N. at 6630 (Funds " 'held' for the bank's or authority's 'own account' ... [include] funds used or held in connection with central banking activities, as distinguished from funds used solely to finance the commercial transactions of other entities or of foreign states"), and apparently is the only test ever to be applied by a federal court in this country. *See, e.g., Ministry of Def. & Support for Armed Forces of Islamic Repub. of Iran v. Cubic Def. Sys.*, 385 F.3d 1206, 1223–24 (9th Cir.2004) (discussing

FSIA House Report for the proposition that "held for its own account" means "used or held in connection with central banking activities"), *vacated on other grounds sub nom., Ministry of Def. & Support for Armed Forces of Islamic Repub. of Iran v. Elahi*, 546 U.S. 450, 126 S.Ct. 1193, 163 L.Ed.2d 1047 (2006); *Bank of Credit & Commerce Int'l (Overseas) Ltd. v. State Bank of Pak.*, 46 F.Supp.2d 231, 239 (S.D.N.Y.1999) ("Pursuant to 28 U.S.C. § 1611, the property of a foreign central bank held 'for its own account' is immune from attachment in the United States. Funds are considered to be 'held for a central bank's own account' if they are used to perform functions that are normally understood to be the functions of a nation's central bank, and are not *utilized* in commercial activities."), *vacated on other grounds*, 273 F.3d 241 (2d Cir.2001); *Banco Central de Reserva del Peru v. Riggs Nat'l Bank of Washington, D.C.*, 919 F.Supp. 13, 17 (D.D.C.1994) (citing FSIA House Report); *Banque Compafina v. Banco de Guatemala*, 583 F.Supp. 320, 322 (S.D.N.Y.1984) (same).

A second proposed definition of central bank property "held for its own account" is offered by the FRBNY, appearing as *amicus curiae*. FRBNY suggests an alternative definition drawn from the common law of bank deposits. FRBNY *Amicus* Br. 14 (citing *Clackamas Gastroenterology Assocs. P.C. v. Wells*, 538 U.S. 440, 447, 123 S.Ct. 1673, 155 L.Ed.2d 615 (2003) ("[C]ourts will look to the common law to fill gaps in statutory text, particularly when an undefined term has a settled meaning at common law.")).[19] Under the

---

19. In its brief, FRBNY discussed both the "plain language" test and the "central bank activities" test but did not urge this Court to adopt one or the other, under the theory that the FRBNY Funds are entitled to immunity pursuant to § 1611(b)(1) under both tests. *Compare* FRBNY *Amicus* Br. 16 ("Where, as

here, a deposit is denominated in the central bank's own name, that deposit is the property of the central bank held for its own account."), *with id.* at 18 ("Under the 'central banking functions' test, the funds in the BCRA Account are clearly property of a central bank held for its own account.").

so-called "plain language test," property of a central bank is "held for its own account" if it is in an account in the central bank's name because "[u]nder fundamental banking law principles, a positive balance in a bank account reflects a debt from the bank to the depositor" and no one else. *Id.* (citing *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 21, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995) (a bank account "consists of nothing more or less than a promise to pay, from the bank to the depositor")); *see also Bradford v. Chase Nat'l Bank*, 24 F.Supp. 28, 38 (S.D.N.Y.1938) ("[T]he best, if not the only, way in which the possession of a chose in action—such as a bank account—can be shown, is by showing in whose name the account stands, for the person in whose name the account stands has absolute control of it and that is all possession of a chose in action can mean."), *aff'd sub nom., Berger v. Chase Nat'l Bank*, 105 F.2d 1001 (2d Cir.1939), *aff'd*, 309 U.S. 632, 60 S.Ct. 707, 708, 84 L.Ed. 990 (1940). Indeed, in 1993, the district court in *Weston Compagnie de Finance et D'Investissement, S.A. v. La Republica del Ecuador* concluded—without referring to it by name—that the "plain language" test is a necessary but not sufficient condition for central bank property immunity under § 1611(b)(1). 823 F.Supp. 1106, 1112 (S.D.N.Y.1993) ("Any funds in an account in the name of a foreign central bank are thus funds 'of' that foreign central bank.... To say that, however, does not end the inquiry. Such funds are, under § 1611(b)(1), immune from attachment only if 'held for [the foreign central bank's] own account.'" (alteration in original)).

Finally, relying on a "grammatical and syntactical construction of Section 1611(b)," plaintiffs suggest a third definition of property of a central bank "held for its account": "[p]roperty of a central bank is 'held for its own account' when it is held for [the central bank's] own profit or advantage." Pls.' Br. 77–78. According to plaintiffs,

> in the statutory phrase "property ... of a foreign central bank held for its own account": (1) the words "its own" refer back to the term "central bank" (not "property"); and (2) the word "for" denotes that the words that follow—"its own account"—constitute the purpose for which the property is "held." . . . .
> Because Congress employed the word "account" to identify a particular purpose—the motivation—of the central bank for holding the "property," the only definition of "account" that makes sense is "profit, advantage."

*Id.* at 77. (quoting Webster's New Int'l Unabridged Dictionary 12 (3d ed.1976) (sixth definition of the noun "account") (emphases omitted)). Drawing on this definition, plaintiffs argue that if, pursuant to *Bancec*, a court were to disregard the juridical separateness of BCRA, the FRBNY Funds "cannot be held for the central bank's *own* profit or advantage" because the central bank "is the sovereign." *Id.* at 81 (emphasis in original).

Plaintiffs' definition is novel but cannot be correct. BCRA is charged by statute with power and responsibility over, among other things, issuing and monitoring the stability of the Argentine peso, establishing and implementing monetary policy, investing reserves, acting as the Republic's financial agent and as depository and agent for the Republic before "international monetary, banking and financial entities," and regulating the Argentine banking system and financial sector. *See* BCRA Charter Arts. 1–60; JA Vol. V at 763–75. These are all traditional activities of central banks, *see* Ernest T. Patrikis, *Foreign Central Bank Property: Immunity from Attachment in the United States*, 1982 U. Ill. L.Rev. 265, 274 n.37 (1982) (enumerating "functions of central banks"),

which are performed "in the national economic interest," de Kock, *Central Banking* at 22. They are also, to a one, functions which defy any attempt to divide the interest of the central bank from that of the state it serves.

An example on this point may be instructive. The District Court identified "the Republic's use of resources of BCRA in 2005 to pay the debt owed to the IMF'" as a "non-regular monetary operation[ ] which BCRA carried out at the behest of the Republic in order to serve the Republic's (not BCRA's) political and economic purposes." *EM Ltd.*, 720 F.Supp.2d at 299. In fact, this transaction was "of great significance," *id.*, in demonstrating "that the Republic could draw on the resources of BCRA at will," *id.* at 300. However, while the Republic's conduct with regard to the Kirchner Decrees demonstrates its *control* over the BCRA—notwithstanding BCRA's statutory independence—it does not follow that early repayment of the Republic's debt to the IMF did not inure to the "profit" or "advantage" of BCRA. As BCRA and the Republic observe, "[t]he debt to the IMF was carried on the books of BCRA as a liability of BCRA to the Republic. . . . It was surely to BCRA's 'advantage' to pay off that debt." BCRA and Republic Joint Reply Br. 27.

Plaintiffs offer no standard for deciding whether a given reserve policy or central bank investment is conducted for the "advantage" of the central bank, or that of its parent state. We suspect that is so because no reasonable strategy for doing so exists. Indeed, as BCRA's charter makes explicit, at the end of each year BCRA's "profits," above and beyond fifty percent of its capital, are required by law to "be freely transferred to the National Government account." BCRA Charter, Art. 38; JA Vol. V at 772. Notwithstanding its independent legal status, asking courts to disaggregate activities that are for BCRA's advantage and not the Republic's (or vice versa) misunderstands the legal structure of BCRA and the very purpose of a central bank.

On the other hand, the "central banking activities" test is not without difficulty, either. On its face, the House Report "distinguishe[s]" between property "used or held in connection with central banking activities," which is immune from attachment under § 1611(b)(1), and that used "solely to finance the commercial transactions . . . of foreign states," which is not. FSIA House Report 31, *reprinted in* 1976 U.S.C.C.A.N. at 6630. However, the structure of the FSIA suggests that property used for commercial activity and property of a central bank held for its own account are not mutually exclusive categories, because some property of a central bank held for its own account *is* a category of property used for commercial activity. As the District Court in *Weston* observed,

> 28 U.S.C. § 1609 renders all property of a foreign state in the United States immune from attachment, except as provided in §§ 1610 and 1611, which except from the operation of § 1609, upon certain conditions, "property in the United States of a foreign state . . . used for a commercial activity in the United States." 28 U.S.C. § 1610(a) and (d) (1988). 28 U.S.C. § 1611(b)(1) then provides that, "[n]otwithstanding the provisions of section 1610 of this chapter, the property of a foreign state shall be immune from attachment . . ." if it is property "of a foreign central bank or monetary authority held for its own account," subject to waiver of postjudgment attachment. 28 U.S.C. § 1611(b)(1), in other words, is an exception to § 1610, providing for immunity from attachment that would otherwise be allowed by § 1610. Without § 1610, no property of a foreign state would be subject to attachment; § 1610, however, allows at-

tachment only of property "used for a commercial activity." The property referred to in § 1611(b)(1) therefore must be property used for a commercial activity: if it were not, it would not be attachable at all. It follows that a showing that property of a central bank is used for a commercial activity does not, of itself, exclude it from the immunity granted by § 1611(b)(1).

*Weston*, 823 F.Supp. at 1112.

In order to resolve this tension, one practitioner of central banking law has proposed a modified central bank functions test, pursuant to which "property of a central bank is immune from attachment if the central bank uses such property for central banking functions as such functions are normally understood, irrespective of their commercial nature." Patrikis, *Foreign Central Bank Property*, 1982 U. Ill. L.Rev. at 277. Conversely, "if an activity is to be regarded as commercial, as distinguished from a central bank activity, it should be an activity of the foreign central bank not generally regarded as a central banking activity." *Id.* at 277–78. This test was adopted by the district court in *Weston, see* 823 F.Supp. at 1113, and, more recently, by another district court in *Olympic Chartering, S.A. v. Ministry of Indus. & Trade of Jordan*, 134 F.Supp.2d 528, 534 (S.D.N.Y.2001) ("If the funds at issue are used for central bank functions as these are normally understood, then they are immune from attachment, even if used for commercial purposes.").

We think that this modified test—which combines the "plain language" of the statute and "central bank activities" tests as conjunctive requirements—accords with the text and purpose of § 1611(b)(1), and we therefore adopt this test for purposes of determining whether central bank property is "held for its own account." Where funds are held in an account in the name of a central bank or monetary authority, the funds are presumed to be immune from attachment under § 1611(b)(1). This presumption is consistent with the recognition that "FSIA immunity is immunity not only from liability, but also from the costs, in time and expense, and other disruptions attendant to litigation." *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 849 (5th Cir.2000); *see also EM I*, 473 F.3d at 486 (district courts must calibrate the " 'delicate balancing between permitting discovery to substantiate exceptions to statutory foreign sovereign immunity and protecting a sovereign's or sovereign agency's legitimate claim to immunity from discovery' ") (quoting *First City, Texas–Houston, N.A. v. Rafidain Bank*, 150 F.3d 172, 176 (2d Cir.1998) (quotation marks omitted)). A plaintiff, however, can rebut that presumption by demonstrating with specificity that the funds are not being used for central banking functions as such functions are normally understood, irrespective of their "commercial" nature.[20]

Had the District Court applied this test, it would have concluded that the

---

**20.** We recognize that there is no definitive list of activities "normally understood" to be central banking functions. Indeed, the definition of what constitutes a "central bank activity" is likely to change over time. However, as this case illustrates, even in unusual circumstances it is not difficult to tell whether a central bank is engaged in a function characteristic of central banks. If that were to change—or if the sphere of normally understood central bank activities were to significantly exceed Congress's understanding of those activities deserving of sovereign immunity—it is likely that Congress's interest in preserving the immunity of central bank property would change as well. In that instance, we have no doubt that Congress could and would "recalibrate" the FSIA's statutory scheme as necessary.

FRBNY Funds were property of the BCRA held for the central bank's own account at FRBNY. We have already established that the FRBNY Funds are held in BCRA's name at FRBNY. *See EM I*, 473 F.3d at 473 ("[T]he FRBNY Funds that plaintiffs seek to attach are held in BCRA's name."). Pursuant to the parties' March 2009 Stipulation, the FRBNY Funds of December 30, 2005 are said to have been derived from four types of transactions conducted by BCRA: (1) $31 million was transferred into the FRBNY account in order to pay Argentine banks that sought to reduce the amount of their U.S. dollar reserves; (2) $32.2 million was transferred into the account because certain Argentine banks were increasing their U.S. dollar reserves; (3) BCRA had purchased approximately $35 million in U.S. dollars throughout the day in order to control its currency; and (4) $1.2 million was deposited pursuant to a regulatory exchange rule that BCRA imposed on Argentine exporters. *See EM Ltd.*, 720 F.Supp.2d at 303. The record clearly establishes that the accumulation of foreign exchange reserves to facilitate the regulation of the peso and the custody of cash reserves of commercial banks pursuant to central bank regulations are paradigmatic central banking functions; *see also Filler v. Hanvit Bank*, 378 F.3d 213, 217 (2d Cir.2004) (recognizing that "protecting depositors and promoting financial stability" are "functions traditionally performed by the government" in the context of an instrumentality's immunity under FSIA).

### (v)

Having concluded that the FRBNY Funds are property of the BCRA "held for its own account," the final question under § 1611(b)(1) is whether there has been an effective waiver of immunity with respect to that property.

Section 1611(b)(1) provides that the only exception to the immunity for property of a central bank or monetary authority held for its own account is where "such bank or authority, or its parent foreign government, has explicitly waived its immunity from attachment in aid of execution, or from execution." 28 U.S.C. § 1611(b)(1).

The District Court concluded that the Republic had explicitly waived *its* immunity. *See EM Ltd.*, 720 F.Supp.2d at 301. The terms and conditions governing the bonds provide that—with regard to any potential immunity from attachment and execution of the Republic's property—"the Republic has irrevocably agreed not to claim and has irrevocably waived such immunity to the fullest extent permitted by the laws of such jurisdiction and consents generally for the purposes of the Foreign Sovereign Immunities Act to the giving of any relief or the issue of any process in connection with any Related Proceeding or Related Judgment." [21] Terms and Conditions Governing the 10.000% New AR$ Global Bond due September 19, 2008, ISIN # XS0130278467, at *12; JA Vol. V at 346. [22]

■ However, the District Court also concluded that "there has been no waiver of immunity *with respect to BCRA.*" *EM Ltd.*, 720 F.Supp.2d at 297 (emphasis supplied). We agree. Waiver under the FSIA must be "clear and unambiguous." *Carpenter v. Republic of Chile*, 610 F.3d 776, 779 (2d Cir.2010). In circumstances in which we have recognized the waiver of

---

**21.** The Terms and Conditions define a Related Proceeding as "any suit, action, or proceeding against it or its properties, assets or revenues with respect to the Securities of this Series or the Fiscal Agency Agreement," and a Related

Judgment as a "final non-appealable judgment in any such Related Proceeding."

**22.** The Terms and Conditions of all of the other instruments at issue in this litigation contain the same or similar waivers.

immunity with respect to an agency or instrumentality of a foreign state, that waiver has specifically embraced the foreign state *and* the relevant agency or instrumentality. *See, e.g., LNC Invs., Inc. v. Republic of Nicaragua*, 115 F.Supp.2d 358, 361 (S.D.N.Y.2000), *aff'd sub nom., LNC Invs., Inc. v. Banco Central De Nicaragua*, 228 F.3d 423 (2d Cir.2000) (waving immunity "[t]o the extent that the Republic or any Governmental Agency has or hereafter may acquire any immunity from jurisdiction of any court").

■■■ Here, while the Republic waived immunity under the FSIA for "the Republic or any of its revenues, assets or property," the Republic's waiver did not mention the "instrumentalities" of the Republic or BCRA in particular, much less BCRA's reserves at FRBNY. As we previously observed, "although the Republic's waiver of immunity from attachment is worded broadly, it does not appear to clearly and unambiguously waive BCRA's immunity from attachment, as it must do in order to be effective." *EM I*, 473 F.3d at 485 n.22.

### D.

One need not have what Argentina's great gift to literature termed a "case[ ] of prodigious memory" to recall the Republic's appalling record of keeping its promises to its creditors.[23] *See id.* at 466, n.2. Argentina's record in global bond markets has given new meaning to the concept of *caveat emptor.* Even when the Argentine people offer a substantial premium to those adventurous souls who risk a loan to the country, for many investors, the experience of being a creditor to the Republic has been a profile in disappointment.

In the particular circumstances presented here, there is no doubt, as the District Court recognized, that while the Republic provided explicit assurances in its bonds that plaintiffs would have recourse to hold it to its promises, "[w]hat the bonds do not say is that the law of this jurisdiction—the Foreign Sovereign Immunities Act—imposes severe restrictions upon the ability of a creditor of the Republic to obtain an attachment or execution." *EM Ltd.*, 720 F.Supp.2d at 301. We share the District Court's understandable irritation at the Republic's "willful defiance of [its] obligations to honor the judgments of a federal court." *Id.* at 304. Indeed, as we have had occasion to observe before, "[w]e understand the frustration of the plaintiffs who are attempting to recover on judgments they have secured. Nevertheless, we must respect the [FSIA's] strict limitations on attaching and executing upon assets of a foreign state." *Aurelius Capital Partners*, 584 F.3d at 132.

Because BCRA's sovereign immunity over the FRBNY Funds has not been waived and the FRBNY Funds are property of BCRA held for its own account under 28 U.S.C. § 1611(b)(1), we hold that the FRBNY Funds are immune from attachment and restraint. The District Court therefore erred in concluding that it had subject-matter jurisdiction to adjudicate a suit for attachment and restraint of the FRBNY Funds.[24] The April 7, 2010 opin-

---

**23.** Jorge Luis Borges used the phrase "prodigious memory" to describe Ireneo Funes, a fictional character who "remembered not only every leaf of every tree in every patch of forest, but every time he had perceived or imagined that leaf." Jorge Luis Borges, *Funes, His Memory, in* Collected Fictions 134, 136 (Andrew Hurley trans., Penguin Books 1998) (1942).

**24.** Because we conclude that FRBNY Funds are immune from attachment and execution pursuant to § 1611(b)(1), we need not reach the question of whether the District Court correctly determined that the Republic's control of BCRA was sufficient to disregard the presumption of juridical separateness under *Bancec.* We intimate no view on that question.

ion and all associated orders of the District Court are vacated and the cause is remanded to the District Court for further proceedings consistent with this opinion.

## CONCLUSION

To summarize:

(1) Plaintiffs' motion for certification of the appeal under 28 U.S.C. § 1292(b) is granted because the District Court's ruling involves unresolved questions of law and an appeal would advance the termination of the litigation. *See EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 471 (2d Cir.2007).

(2) Plaintiffs' motions to attach the FRBNY Funds are not barred under the doctrine of claim preclusion because the 2005 motions vacated by this Court in *EM I* were not final judgments on the merits. *See Dayco Corp. v. Foreign Transactions Corp.*, 705 F.2d 38, 39 (2d Cir.1983).

(3) Plaintiffs' motions to attach the FRBNY Funds are not barred under the doctrine of issue preclusion because the issue presented on appeal—whether the FRBNY Funds are attachable *because* BCRA is not entitled to the presumption of juridical separateness under *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983)—was not litigated and decided by a court of competent jurisdiction in a prior proceeding. *See Ali v. Mukasey*, 529 F.3d 478, 489 (2d Cir.2007).

(4) Section 1611(b)(1) immunizes the property of a central bank or monetary authority "held for its own account" without regard to whether the bank or authority is entitled to a presumption of independence from its parent state under *First National City Bank v. Banco Para El Com-*

*ercio Exterior de Cuba*, 462 U.S. 611, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983).

(5) Where funds are held in an account in the name of a central bank or monetary authority, the funds are presumed to be immune from attachment under § 1611(b)(1); this presumption may be rebutted by demonstrating with specificity that the funds are not being used for central banking functions as such functions are normally understood, irrespective of their "commercial" nature.

(6) The Republic's waiver of immunity is not sufficiently explicit and unambiguous so as to waive BCRA's immunity with respect to the FRBNY funds pursuant to § 1611(b)(1).

Accordingly, for the reasons stated above, we hold that the FRBNY Funds are immune from attachment and execution. The orders of the District Court related to plaintiffs' motions to attach the FRBNY Funds are vacated and the cause is remanded for further proceedings consistent with this opinion.